MCCANN REAL EQUITIES SERIES XXII, LLC, ET AL.
*v*. DAVID MCDERMOTT CHEVROLET, INC., ET AL.
(AC 26347)

Schaller, Dranginis and Peters, Js.

Argued November 28, 2005—officially released January 31, 2006

*Kenneth A. Votre,* with whom was *Keith P. Sturges,* for the appellants (plaintiffs).

*David L. Weiss,* for the appellees (defendants).

Opinion

DRANGINIS, J. This appeal from the judgment rendered on a verdict directed by the trial court concerns the sale and purchase of real property. Subsequent to the closing of the transaction, the buyers learned that the soil contained more contamination than they had expected. The buyers sought to recoup from the sellers the cost of removing the contaminated soil and consequential damages generally on the basis of breach of contract and the sellers' misrepresentation as to a portion of the premises. The buyers cannot prevail, however, because the "as is" and merger provisions of the contract bar recovery; see footnote 12; and the buyers did not justifiably rely on the sellers' representations, nor were the representations the proximate cause of their injury. We therefore affirm the judgment of the trial court.

The underlying facts are not in dispute. On April 15, 1996, the plaintiffs, McCann Real Equities Series XXII, LLC (McCann), and Coral New Haven Associates, LLC (Coral New Haven),[1] entered into a written agreement with the defendants, David McDermott Chevrolet, Inc.,

_____

[1] The amended complaint alleges that Coral New Haven is the successor in interest to McCann, that McCann was the entity that entered into the agreement with the defendants and that Coral New Haven was the entity that purchased the property at issue.

David M. McDermott doing business as McDermott Realty and David McDermott, Inc.,[2] to purchase four acres of real property that had been used throughout the twentieth century for automobile sales and related services. In November, 1996, the plaintiffs received a report from their environmental experts informing them that there were 10,000 gallons of oil and water in the basement of one of the buildings on the property. Their further investigation revealed that the concrete forming the basement and the surrounding soil were contaminated by oil. The plaintiffs did not bring the results of their investigation to the defendants' attention at that time and purchased the premises on July 28, 1997. In March, 2000, the department of environmental protection (department) informed the plaintiffs that the soil surrounding the building was contaminated and ordered them to remediate the soil. In July, 2000, the plaintiffs commenced this action against the defendants for alleged breach of contract, misrepresentation and indemnification, among other claims, to recoup the cost of remediating the soil and for consequential damages.

The case was tried in September, 2004. At the conclusion of the plaintiffs' presentation of evidence, the defendants moved for a directed verdict. The court reserved judgment on the motion for a directed verdict, but the following day, it instructed the jury to return a verdict in favor of the defendants. The plaintiffs subsequently filed a motion to set aside the directed verdict, which the court denied in a thirty-two page memorandum of decision.

The plaintiffs have appealed from the judgment rendered by the court. In their statement of the issues, the plaintiffs have asserted twelve claims for us to consider.[3] We are not persuaded by the plaintiffs' claims

[2] We refer to David M. McDermott, the individual, as McDermott.

[3] The plaintiffs claim that the court improperly directed the verdict as to each count of their amended complaint, usurped their constitutional right to have the jury determine the factual issues, misapplied the doctrine of

because we conclude that the court properly determined (1) that the plaintiffs did not rely on the misrepresentation by McDermott, (2) that no reasonable person could conclude that the plaintiffs' claimed reliance was justifiable or that the misrepresentation was the proximate cause of their loss and (3) that, regardless of the defendants' alleged wrongdoing, the plaintiffs had bargained away their rights in the agreement.

## STANDARD OF REVIEW

"The standards for reviewing a challenge to a directed verdict are well known. Generally, litigants have a constitutional right to have factual issues resolved by the jury. . . . Directed verdicts [therefore] are historically not favored and can be upheld on appeal only when the jury could not have reasonably and legally reached any other conclusion. . . . We review a trial court's decision to direct a verdict for the defendant by considering all of the evidence, including reasonable inferences, in the light most favorable to the plaintiff." (Internal quotation marks omitted.) *Young* v. *Rutkin*, 79 Conn. App. 355, 363, 830 A.2d 340, cert. denied, 266 Conn. 920, 835 A.2d 60 (2003). "Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . *A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party.*" (Emphasis added; internal quotation marks omitted.) *Robinson* v. *Galino*, 275 Conn. 290, 297, 880 A.2d 127 (2005).

"It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." (Internal quotation marks omitted.) *Wright* v.

merger with respect to their claims of misrepresentation and applied the incorrect statute of limitations to their indemnification claims. Many of the plaintiffs' claims are repetitious.

*Hutt,* 50 Conn. App. 439, 449, 718 A.2d 969, cert. denied, 247 Conn. 939, 723 A.2d 320 (1998). "A material fact is a fact that will make a difference in the result of the case. . . . *The facts at issue are those alleged in the pleadings.* . . . The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Vaillancourt* v. *Latifi,* 81 Conn. App. 541, 545, 840 A.2d 1209 (2004). "[F]acts must be pleaded as a special defense when they are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action. Practice Book § 10-50 . . . . The fundamental purpose of a special defense, like other pleadings, is to apprise the court and opposing counsel of the issues to be tried, so that basic issues are not concealed until the trial is underway." (Citation omitted; internal quotation marks omitted.) *Almada* v. *Wausau Business Ins. Co.,* 274 Conn. 449, 456, 876 A.2d 535 (2005).

"[T]he interpretation of pleadings is always a question of law for the court . . . . Our review of the trial court's interpretation of the pleadings therefore is plenary. . . . Furthermore, [t]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties." (Citations omitted; internal quotation marks omitted.) *Bross* v. *Hillside Acres, Inc.,* 92 Conn. App. 773, 778–79, 887 A.2d 420 (2006).

### THE PLEADINGS

In their amended complaint filed August 17, 2000, the plaintiffs alleged, inter alia, that they entered into a written agreement, dated April 15, 1996, with the defendants to purchase approximately four acres of improved real property situated on Whalley Avenue in New

Haven. The plaintiffs further alleged that the agreement contained representations and warranties with regard to the sale of the premises, i.e., that the defendants had agreed to " 'comply with all laws, ordinances, regulations, orders or notices of violations of or issued by any Governmental Authority' prior to closing which representation contractually obligated the defendants as sellers to abide by all state, federal and local laws and ordinances relating to the property and to fully comply with all notices of violation issued in regards to the real property." The plaintiffs also alleged that the defendants represented and warranted that "there are no actions, suits or proceedings pending or, to the best knowledge of [the defendants], threatened against [the defendants], at law or in equity, by or before any Federal, State, Municipal or other governmental court, department, commission, board, bureau, agency or instrumentality which in the event of a decision adverse to [the defendants] would prevent the consummation of the transactions contemplated by this Agreement."

The plaintiffs alleged that the defendants breached their contractual obligations in violation of the affirmative representations they made in the agreement. Specifically the plaintiffs alleged that the defendants "(a) . . . failed to comply with certain notices of violation issued by the [department]; (b) . . . failed to comply with local, State and federal environmental laws affecting the . . . property prior to closing; (c) . . . failed to disclose the existence of notices of violation during that period of time after execution of the . . . agreement and in particular, following the environmental contingency period contained in the . . . agreement; (d) . . . failed to timely and truthfully disclose facts known to them concerning the environmental condition of the . . . property and the existence of current violations; [and] (e) . . . knowingly concealed from the Plaintiffs facts relevant to the Purchase of the

. . . property including, inter alia, the existence of a current environmental investigation relating to the . . . property, issuance of notices of violations and the existence of past violations which were unresolved prior to closing." The plaintiffs alleged that as a consequence of the defendants' failure to comply with the law and to disclose certain correspondence from the department, the plaintiffs sustained significantly increased environmental cleanup costs to comply with the department's order to rid the property of environmental contamination.

The plaintiffs also pleaded counts that sounded in negligent misrepresentation, reckless or indifferent misrepresentation, and intentional and fraudulent misrepresentation, and alleged that the defendants had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The plaintiffs sought common-law and statutory indemnification pursuant to General Statutes § 22a-452 in counts six and seven, respectively. Counts eight and nine of the amended complaint alleged fraudulent concealment and fraud, respectively.

In their answer and amended special defenses,[4] the defendants denied any wrong doing and alleged eight special defenses, four of which are relevant to the directed verdict. The first special defense as to all counts alleged: "Pursuant to the terms of [s]ection 7.3 of the Second Amendment to the Purchase and Sale Agreement dated May 21, 1996, the Plaintiffs . . . agreed that [the plaintiffs] shall after closing *hold* [*the defendants*] *free and harmless* and shall indemnify [the defendants] from any and all claims, including costs and attorney's fees, based on the environmental condition of the Premises and *this release and indemnity shall*

---

[4] The court granted the defendants' motion to amend their special defenses filed in July, 2004. The defendants added two special defenses as to the indemnification count alleged pursuant to General Statutes § 22a-452 on the basis of documents and testimony they acquired during discovery.

*survive the closing* and shall not be limited by the liquidated damages provision in Section 20 . . . ." (Emphasis added; internal quotation marks omitted.) On the basis of § 7.3 of the agreement, the defendants alleged that the plaintiffs cannot recover damages under the claims alleged in the amended complaint.

The defendants alleged in their fourth special defense as to all counts that pursuant to § 16 of the amended agreement, the plaintiffs' acceptance of a deed and bill of sale was deemed to be full performance by the defendants that discharged them from all obligations to be performed under the agreement, except those that survived the closing. Furthermore, the defendants alleged, because the sections of the agreement that the defendants were alleged to have violated did not survive the closing, the plaintiffs waived the right to assert the claims they alleged in their amended complaint and were estopped from recovering under them.

The defendants alleged in the first special defense as to count seven (indemnification pursuant to § 22a-452) that the plaintiffs' claims were barred by the applicable statute of limitations, General Statutes § 52-577,[5] because the acts or omissions complained of in count seven occurred more than three years prior to the date of the amended complaint. The defendants also alleged that the plaintiffs knew of the alleged misrepresentations or omissions concerning the alleged environmental violations as early as November, 1996, and as late as July, 1997, prior to the closing, because they were in receipt of an environmental site assessment conducted by their environmental experts. The defendants alleged that the plaintiffs also knew of the alleged misrepresentations and omissions in July, 1997, because

---

[5] General Statutes § 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

their counsel had made written demand on the defendants to perform environmental remediation. The defendants alleged that because the plaintiffs had actual knowledge of the environmental violations alleged to exist on the property more than three years prior to the date of the amended complaint, those claims alleged in count seven were time barred.

The defendants' second special defense as to count seven alleged that the plaintiffs' claims were time barred pursuant to General Statutes § 52-577c (b)[6] because the plaintiffs' discovery of the defendants' alleged misrepresentations or omissions regarding the environmental contamination of the property occurred more than two years prior to August 17, 2000, when the amended complaint was filed. The plaintiffs denied all of the defendants' special defenses.

## THE AGREEMENT

The purchase and sale agreement, dated April 15, 1996, as amended on May 21, 1996, is the basis of the plaintiffs' claims against the defendants. The salient provisions of the agreement are §§ 7.3 (inspection provision)[7] and 7.6 (contingency provi-

[6] General Statutes § 52-577c (b) provides: "Notwithstanding the provisions of sections 52-577 and 52-577a, no action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture or hazardous pollutant released into the environment shall be brought but within two years from the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered."

[7] Section 7.3 of the second amended agreement provides: "Buyer's Environmental Inspection—Buyer may, at Buyer's sole cost and expense, *within thirty (30) days from the date of this Second Amendment, obtain an environmental site assessment report and perform any and all tests it deems necessary* ('Site Assessment') with respect to the presence, on the Premises, of 'oil', 'hazardous wastes', 'hazardous materials' or 'hazardous substances' or 'underground storage tanks' and any other 'environmental contaminants' (collectively the 'Materials'), as the same are defined in the Comprehensive Environmental Response, Compensation and Liability Act [of 1980], 42 U.S.C. Section 9601 et seq., as amended, the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 9601 et seq., as amended.

sion)[8] of the second amendment to the agreement, and §§ 11 (e) (due diligence provision),[9] 12 (c) (pending litigation provision),[10] 13 (b) (compliance provi-

Buyer shall commence drilling test borings within two weeks from the date of this Second Amendment, subject to force majeure. If the Buyer does not commence the drilling in a timely manner, Buyer waives its rights to terminate this Agreement pursuant to this environmental contingency. In the event that Buyer is not reasonably satisfied with the results of Buyer's Site Assessment in its sole discretion, Buyer may terminate this Agreement by notice to Seller within the said thirty (30) day period which notice shall be accompanied by a copy of Buyer's Site Assessment, report or field notes. If the Buyer so terminates this Agreement, all deposits shall be promptly refunded and this Agreement shall be null and void and without recourse to any party. If the Buyer does not terminated this Agreement within the thirty (30) day period he shall perform after the closing, at his sole cost and expense, such remediation as (i) is recommended in the Buyer's Site assessment report and (ii) is required by Buyer's lender. Buyer shall after closing hold Sellers free and harmless and shall indemnify Sellers from any and all claims, including costs and attorney's fees, based on the environmental condition of the Premises and this release and indemnity shall survive the closing and shall not be limited by the liquidated damages provision in Section 20 . . . ." (Emphasis added.)

[8] Section 7.6 of the second amendment to the agreement provides: "Expiration of Contingencies and Forfeitures of Deposits—Notwithstanding any other provision of this Agreement to the contrary, unless Buyer terminates this Agreement within the time periods as provided for in Section 7.1, 7.2, 7.3 or 7.4 then, immediately upon the expiration of Buyer's rights to terminate pursuant to said Sections, Buyer's right to terminate the Agreement pursuant to said contingencies shall lapse and the Initial Deposit shall become nonrefundable to Buyer except for a failure of Seller to convey the Premises as provided for in this Agreement."

[9] Section 11 of the agreement provides in relevant part: "Buyer's Representations . . . e. INVESTIGATION—IN REACHING ITS DECISION TO PROCEED WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, BUYER HAS RELIED SOLELY UPON ITS INVESTIGATION OF THE PREMISES AND BUYER HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY OF SELLERS, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLERS SET FORTH IN THIS AGREEMENT. BUYER ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO EXAMINE AND REVIEW ANY AND ALL INFORMATION IT DEEMED NECESSARY TO COMPLETE ITS DUE DILIGENCE EXAMINATION AND INVESTIGATION OF THE PREMISES AND IS SATISFIED WITH THE RESULTS OF SAID EXAMINATION."

[10] Section 12 provides in relevant part: "Sellers' Representations—Seller and Corporate Seller represents, warrants and agrees as follows . . . c. No

sion),[11] 15 ("as is" provision),[12] 16 (full performance provision)[13] and 21 (default provision)[14] of the agreement. The plaintiffs placed the agreement and its amendments into evidence.

## FINDINGS OF FACT

The court viewed the evidence in the light most favorable to the plaintiffs and found that the following facts were established.[15] The plaintiffs presented testimony

Litigation—There are no actions, suits or proceedings pending or, to the best knowledge of Sellers, threatened against Sellers, at law or in equity, by or before any Federal, State, Municipal or other government court, department, commission, board, bureau, agency or instrumentality which in the event of a decision adverse to Sellers would prevent the consummation of the transactions contemplated by this Agreement . . . ."

[11] Section 13 of the agreement provides in relevant part: "Between the date hereof and the Closing Date, Seller covenants and agrees as follows . . . b. Sellers will comply with all laws, ordinances, regulations, orders or notices of violations of or issued by any Governmental Authority."

[12] Section 15 of the agreement provides: "NO WARRANTIES/ENTIRE AGREEMENT—EXCEPT AS SPECIFICALLY PROVIDED FOR HEREIN, BUYER ACKNOWLEDGES THAT IT HAS EXAMINED THE PREMISES AGREED TO BE SOLD AND IS BUYING THEM 'AS IS', WITHOUT WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER, WHETHER RELATING TO THE PREMISES' CONDITION OR USE, EXPRESS OR IMPLIED, BY SELLERS OR BY ANY AGENT, EMPLOYEE OR OTHER REPRESENTATIVE OF SELLERS NOT EXPRESSLY STATED HEREIN. ALL UNDERSTANDINGS AND AGREEMENTS HERETOFORE MADE BETWEEN THE PARTIES HERETO ARE MERGED IN THIS AGREEMENT, WHICH ALONE FULLY AND COMPLETELY EXPRESSES THEIR AGREEMENT."

[13] Section 16 of the agreement provides: "ACCEPTANCE OF DEED AND THE BILL OF SALE—THE ACCEPTANCE OF A DEED AND THE BILL OF SALE BY BUYER SHALL BE DEEMED TO BE A FULL PERFORMANCE AND DISCHARGE OF EVERY AGREEMENT AND OBLIGATION ON THE PART OF SELLERS TO BE PERFORMED PURSUANT TO THE PROVISIONS OF THIS AGREEMENT, EXCEPT THOSE STATED TO SURVIVE THE CLOSING."

[14] Section 21 of the agreement provides: "Sellers Default—If Sellers shall fail to fulfill their agreements herein, Buyer may bring an action for Specific performance which shall be its sole remedy under the terms of this Agreement."

[15] The plaintiffs have not challenged any of the court's findings of fact, except the finding that the plaintiffs did not rely on the defendants' misrepresentations. But see footnote 21.

from individuals who had participated in the execution of the agreement, the environmental site assessments and the closing.

On April 15, 1996, the parties entered into a written agreement whereby McCann agreed to purchase the subject property. Martin G. Berger negotiated the contract on behalf of the plaintiffs, and McDermott negotiated on behalf of the defendants. On May 21, 1996, the parties agreed to a second amendment to the agreement, altering the substantive terms of §§ 7.3 and 7.6. The parties also agreed to further amendments to the agreement extending the duration of the plaintiffs' environmental due diligence period provided for under § 7.3.

The plaintiffs sought to purchase the property and to remove the existing improvements to construct a supermarket. For fifteen to eighteen years previously, Berger had been in the business of real estate development, primarily retail shopping centers.[16] The plaintiffs' principal place of business is in New York, and during the negotiations and closing, they were represented by the New York City law firm of Newman, Tannenbaum Helpern, Syracuse and Hirschtritt, LLP, a firm with environmental law expertise. McDermott is president of the defendant David McDermott, Inc., which is in the business of selling new and used automobiles. In 1985, McDermott purchased the subject property, which had been used for automobile related purposes, for his own automobile sales and service business, including oil change. The defendants also were represented by counsel.

After entering into the agreement, the plaintiffs retained the firm of Heynen Teale Engineers (engineers)

---

[16] Prior to negotiating the subject agreement, Berger had developed the premises of the adjacent property, which also had been used for automobile dealerships. The adjacent property was developed for Rite-Aid Corporation and Staples, Inc., retail businesses.

to perform phase I and phase II environmental site assessments of the premises. The proposal that the plaintiffs accepted from the engineers stated in part that "[s]oil samples will be screened for total volatile organic compounds . . . using a Thermo electronics 580A organic vapor meter . . . . Selected soil samples will be analyzed for specific aromatic and chlorinated hydrocarbons . . . ." The environmental assessments consisted of visually inspecting the property for physical evidence of hazardous materials, communicating with governmental agencies, reviewing agency files for information concerning the presence of hazardous materials on the property, reviewing ownership records concerning the current and prior uses of the property, assessing the general hydrogeological setting on the basis of field observations and topographical information and performing test borings.

The premises were honeycombed with underground rooms or basements. Aboveground and belowground storage tanks on the premises were used to hold clean oil, used oil and heating fuel. In performing the site assessments, the engineers divided the property into sixteen areas, designated A through P. The defendants' employees put used oil into two aboveground storage tanks in a basement of area M, which resulted in a substantial oil spill in the room.

Lawrence L. Bee, Jr., a vice president of the engineering firm, inspected the property in March and October, 1996. McDermott or one of his employees, escorted Bee around the property. Bee had unrestricted access to the premises, and he was permitted to take soil samples. On October 31, 1996, Bee and two of his associates discovered that the basement of area M contained a large amount of liquid, as well as two aboveground storage tanks. Thereafter, Berger and McDermott had a telephone conversation during which Berger asked McDermott to identify the liquid in the basement of

area M. McDermott replied that it was "only rainwater" and that the two aboveground storage tanks had never been used.[17] There was no evidence that McDermott told Berger not to test the tanks, the concrete forming the room or the surrounding soil. There also was no evidence that the defendants represented to anyone that the soil around area M was not contaminated.[18]

Berger communicated the information that he had received from McDermott to the engineers. On November 12, 1996, the engineers issued to the plaintiffs a written environmental site assessment in which they reported, among other things, that the building in area M "is a masonry structure containing hydraulic lifts. The northwest corner of the building contains [three aboveground storage tanks] used for possibly virgin oil. The *floor is heavily stained from apparent overfills and improper handling.* Adjacent to the [three aboveground storage tanks] is a basement access with wood steps. The steps appear unsafe and no lighting was observed in the basement. This northwest basement floor, as observed with flashlights, was under [*eight plus or minus*] *inches of oil and water.* The [oil] was apparently *due to overfills of two 275 gallon waste oil [aboveground storage tanks] in the basement* fed from the main level." (Emphasis added.)

The environmental site assessment continued, stating that "[*t*]*he northwest basement area below the virgin oil storage area contains an estimated 10,000 gallons*

---

[17] In their brief on appeal, the defendants argue that McDermott testified that he never had a conversation with Berger concerning any environmental findings. Appellate courts do not make decisions regarding credibility. *Martin Printing, Inc.* v. *Sone*, 89 Conn. App. 336, 347–48, 873 A.2d 232 (2005). Whether McDermott had the subject conversation, however, does not affect our decision. Solely for the purpose of resolving the plaintiffs' claims on appeal, we will assume that McDermott made the alleged representations.

[18] The court concluded that the basis of the plaintiffs' litigation was McDermott's representation that the liquid in the basement of area M was only rainwater.

*of an oil/water mixture on the floor from poor waste oil management practices. The northwest basement walls are stained from the ceiling to the floor.*" (Emphasis added.) It also stated that "[t]he following observations suggest the presence of on-site petroleum releases: a) an estimated 10,000 [plus or minus] gallons of oil and water on the northwest basement floor of Area M; b) overtopping of, and surface staining surrounding, the broken flush-mounted [underground storage tank] fill pipe in Area O; c) surface staining in Area N adjacent to the Area C gasoline [underground storage tank]; and d) staining beneath the Area G basement fuel oil [aboveground storage tank]." And furthermore, the report stated that "[t]he screening and analytical results suggest the *presence of petroleum-related hydrocarbons in soil near the groundwater surface at Area M,* and the presence of gasoline-and solvent-related hydrocarbons near the groundwater surface in the south end of Area K. [Organic vapor meter] screening data suggests the presence of [volatile organic compounds] near the groundwater surface in Areas K, G, L, and M." (Emphasis added.)

Apex Environmental, Inc. (Apex), performed additional environmental testing on the plaintiffs' behalf. Between March 31 and April 4, 1997, Apex observed the drilling of seventeen soil borings and cores of buildings on the property. On June 26, 1997, Apex reported to the plaintiffs that it found no sign of significant contamination at the borings. Also, Apex did not detect significant contamination pursuant to subslab investigations conducted at certain locations. The plaintiffs did not advise the defendants of the findings of either the engineers or Apex prior to the closing in July, 1997. Subsequently, Apex determined that the soil around the area M basement was more contaminated than either it or the engineers previously had determined. Due to the contamination, the soil required extensive remedia-

tion. The plaintiffs claimed that the remediation expenses and construction delay cost them more than $1 million.

## CLAIMS ON APPEAL

The plaintiffs claim that the court improperly directed a verdict as to each of their causes of action, i.e., breach of contract, negligent misrepresentation, reckless misrepresentation, fraudulent and intentional misrepresentation, CUTPA, common-law indemnification, statutory indemnification, fraudulent concealment and fraud. The plaintiffs have argued that they presented evidence as to each element of the causes of action alleged, and that the court improperly weighed the evidence and made findings of fact, thereby usurping their right to a jury trial. The plaintiffs also claim that the court misapplied the doctrine of merger to the misrepresentation claims and applied the incorrect statute of limitations to their indemnification claims. We do not agree with the plaintiffs.

I

The plaintiffs claim that the court improperly directed a verdict as to the breach of contract claim because it improperly concluded that (1) they failed to prove that the defendants had breached the compliance provision of the agreement, (2) the compliance and no litigation provisions of the agreement did not survive the closing, (3) there was no litigation or threat of litigation pending against the defendants, (4) the plaintiffs did not rely on McDermott's representation as to the nature of the liquid in the basement of area M and (5) McDermott's misrepresentations did not supersede the "as is" provision of the agreement. We are not convinced.

Before undertaking our analysis of the claim, we review the relevant rules of contract construction. "We construe a contract in accordance with what we con-

clude to be the understanding and intention of the parties as determined from the language used by them interpreted in light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) *N.E. Leasing, LLC* v. *Paoletta*, 89 Conn. App. 766, 775, 877 A.2d 840, cert. denied, 275 Conn. 921, 883 A.2d 1245 (2005). The intention of the parties manifested by their words and acts is essential. "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract." (Internal quotation marks omitted.) *Middlesex Mutual Assurance Co.* v. *Vaszil*, 89 Conn. App. 482, 498–99, 873 A.2d 1030, cert. granted on other grounds, 275 Conn. 911, 882 A.2d 673 (2005). "A court will not torture words to import ambiguity when the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (Internal quotation marks omitted.) Id., 499. The plaintiffs do not contend that the agreement is ambiguous. Its construction, therefore, is a question of law that requires plenary review. *Issler* v. *Issler*, 250 Conn. 226, 235–36, 737 A.2d 383 (1999). "Under plenary review, we must decide whether the trial court's conclusions of law are legally and logically correct and find support in the record." *Montoya* v. *Montoya*, 91 Conn. App. 407, 416, 881 A.2d 319, cert. granted on other grounds, 276 Conn. 916, 888 A.2d 85 (2005).

In their brief, the plaintiffs state the elements of a cause of action founded on breach of contract, i.e., (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the opposing

party and (4) damages. See *Rosato* v. *Mascardo*, 82 Conn. App. 396, 411, 844 A.2d 893 (2004). The plaintiffs omit, however, that the nonbreaching party "may recover only for damages that are direct[ly] and proximate[ly] caused by a defendant's breach of contract, causation is an element—and a crucial one—of the plaintiff's prima facie case." (Internal quotation marks omitted.) *National Market Share, Inc.* v. *Sterling National Bank*, 392 F.3d 520, 526 (2d Cir. 2004).

In directing the verdict in the defendants' favor, the court explained to the jury that construction of the agreement was a question of law for the court to decide. The court informed the jury that the agreement did not require the defendants to disclose letters from the department concerning its annual inspection of the property or even facts known to them concerning the environmental condition of the property.[19] Although the defendants had agreed to comply with the law, and the liquid in the basement of area M was a violation of the law, pursuant to the parties' agreement, that provision

---

[19] The court noted for the jury that the plaintiffs had argued that the defendants were required to disclose the letters they had received from the department pursuant to an implied covenant of good faith and fair dealing. The court explained, however, that the implied covenant of good faith and fair dealing is only a rule of contract construction that is used to interpret what is written in an agreement, not to rewrite it. See, e.g., *Southbridge Associates, LLC* v. *Garofalo*, 53 Conn. App. 11, 16, 728 A.2d 1114 ("The implied covenant of good faith and fair dealing requires faithfulness to an agreed common purpose and consistency with the justified expectation of the other party in the performance of every contract. . . . Essentially, it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy." [Citation omitted; internal quotation marks omitted.]), cert. denied, 249 Conn. 919, 733 A.2d 229 (1999). The agreement, the court concluded, did not require the defendants to disclose the letters from the department, as the plaintiffs had alleged. We note that the plaintiffs failed to plead a cause of action sounding in breach of the implied covenant of good faith and fair dealing.

of the agreement did not survive the closing because of the "as is" and full performance provisions of the agreement. In addition, pursuant to the merger provision of the agreement, when the plaintiffs accepted the deed and bill of sale, the defendants had fulfilled their obligations under the agreement. The court also explained the "as is" and hold harmless provisions of the agreement and that our Supreme Court's decision in *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 628 A.2d 1298 (1993), controlled the construction of the "as is" provision.[20]

In their motion to set aside the directed verdict, the plaintiffs argued that the defendants had breached the agreement by failing to disclose letters related to environmental inspections that they had received from the department between 1994 and 1997 and that the condition of the basement of area M violated the compliance provision of the agreement. In its memorandum of deci-

---

[20] In *Holly Hill Holdings*, our Supreme Court determined, assuming that it would recognize a private right of action, whether "the transferee could prevail on that action in a case, such as this, where the transferee purchased the property 'as is' with actual knowledge that it may contain the particular environmental hazard that is the focus of the regulation at issue. . . . [*T*]*he proper focus is not on the meaning of the regulation, but on the terms of the contract to which the parties agreed. It is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree.* This freedom includes the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract. Accordingly, in private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability." (Emphasis added.) *Holly Hill Holdings* v. *Lowman*, supra, 226 Conn. 755–56. "The [*Holly Hill Holdings*] defendants contend . . . that the general contract rule should be set aside . . . because they were mistaken, not about the existence of a potential environmental hazard, but about its extent. They cannot prevail on this point, however, because the purpose and effect of an 'as is' clause is to shift the burden of such a mistake to the accepting party." (Citation omitted.) Id., 757.

sion, the court reviewed the letters at issue,[21] which the department had sent to the defendants following each of its inspections of the premises in 1994, 1995 and 1996.

The court found that the agreement did not require the defendants to disclose the contents of the department's letters and that the issues addressed in the letters had nothing to do with the condition of the basement in area M or the surrounding soil. Importantly, following a March, 1997 inspection, the department's letter stated, among other things, that "many of the problems found during previous inspections had finally been corrected." The department criticized, however, the defendants' failure to dispose of spent antifreeze and waste oil separately.

The court concluded that the no pending litigation provision of the agreement, § 12 (c), was the only provision that could give rise to a duty to disclose the contents of the letters. Pursuant to § 16 of the agreement; see footnote 13 (full performance provision); § 12 (c) was not one of the provisions of the agreement that survived the closing. See footnote 10. Furthermore, the letters were not evidence of litigation pending against the defendants or threats of future litigation, as they merely conveyed the results of annual inspections. Although the plaintiffs characterized the letters from the department as notices of violations, by statute, they were not of that character. At the times the letters were sent to the defendants, department notice of violations were controlled by General Statutes § 22a-6b.[22] The

---

[21] The matters of concern to the inspectors at different times had to do with the disposal of oil contaminated sawdust, disposal of a fifty-five gallon drum of paint thinner, records maintenance and an open waste paint container. The letters also transmitted information to facilitate compliance with environmental laws and regulations. Notably, the department's 1997 letter stated that the inspection revealed that all but one of the problems found during prior inspections and been corrected, which was related to the loss of a document.

[22] General Statutes § 22a-6b (c) provides: "If the commissioner has reason to believe that a violation has occurred for which a civil penalty is authorized

court found that there was no evidence that the letters or their contents fell within the parameters of § 22a-6b and, therefore, the defendants never received a notice of violation or the threat of enforcement from the department.

Construction of a statute is a question of law; *Szewc-zyk* v. *Dept. of Social Services*, 275 Conn. 464, 474, 881 A.2d 259 (2005); as is the construction of an unambiguous agreement; *Middlesex Mutual Assurance Co.* v. *Vaszil*, supra, 89 Conn. App. 498; and the allegations of a complaint. *Bross* v. *Hillside Acres, Inc.*, supra, 92 Conn. App. 778. On the basis of our review of the letters, § 22a-6b and the allegations of the amended complaint, we agree with the court that the letters did not constitute litigation or pending litigation and that the substance of the issues addressed by the department in the letters was unrelated to the plaintiffs' claim of damages.

In addition, with respect to the letters from the department, the court concluded that there was no evidence that any adverse decision by the department would have prevented the parties from closing the sale and purchase agreement. Section 12 (c) of the agreement defined an adverse decision by the department as one that would have "prevent[ed] the consummation of the transactions contemplated by [the] Agreement . . . ." The clause cannot be read out of the parties' agreement; see *Bird Peak Road Assn., Inc.* v. *Bird Peak Corp.*, 62 Conn. App. 551, 557, 771 A.2d 260, cert. denied, 256 Conn. 917, 773 A.2d 943 (2001);

by this section, he may send to the violator, by certified mail, return receipt requested, or personal service, a notice which shall include: (1) a reference to the sections of the statute, regulation, or order or permit involved; (2) A short and plain statement of the matters asserted or charged; (3) A statement of the amount of the civil penalty or penalties or the method for calculating the penalty or penalties to be imposed upon finding after hearing that a violation has occurred or upon default; and (4) A statement of the party's right to a hearing."

and proof of an adverse decision cannot be supplied by surmise or assumption.

Finally, with respect to the letters, the court concluded that no reasonable person could have concluded that the defendants' failure to disclose the letters to the plaintiffs was the cause of their damages. See *Davis* v. *Fitzpatrick's, Inc.*, 5 Conn. App. 469, 472, 499 A.2d 805 (1985) (plaintiff must establish causal relation between breach, damages). The damages the plaintiffs claimed concerned area M and were wholly unrelated to the matters raised in the department's letters between 1994 and 1997, e.g., disposal of sawdust, documentation of the removal of a fifty-five gallon drum of waste paint thinner, failure to perform a hazardous waste determination on antifreeze and waste masking paper contaminated with paint and the handling of spent antifreeze. None of the department's letters concerned area M. Consequently, the plaintiffs failed to present any evidence that the defendants' failure to disclose letters from the department between 1994 and 1997 was the proximate cause of their alleged damages. We agree with the conclusions of the court.

The plaintiffs' second principal claim that the defendants breached the agreement is that the condition of the basement in area M violated the compliance provision of the agreement, § 13 (b). See footnote 11. The court found that a reasonable jury could have concluded that the condition of the basement in area M was a violation of Connecticut law and department regulations. Section 13 (b) was another of the provisions of the agreement that did not survive the closing. See footnote 13 (full performance provision). What is more, even if the defendants had failed to fulfill their obligation under § 13 (b), the plaintiffs' sole remedy, under the default provision of the agreement, was specific performance. See footnote 14.

The plaintiffs' evidence demonstrated that there was *no causal connection* between the plaintiffs' alleged damages, and McDermott's representation that the liquid in the basement of area M was rainwater and that the aboveground storage tanks there had never been used. Most significantly, the court found no evidence that the plaintiffs, through Berger, relied on McDermott's representations. First, the court noted that the plaintiffs did not commence their environmental site assessment within thirty days of the second amendment to the agreement, as provided by § 7.3 of the agreement. See footnote 7. Also, the plaintiffs never exercised their right to cancel the agreement.

Berger testified that the plaintiffs let the environmental contingency lapse on July 3, 1996. The engineers found liquid in the basement of area M in October, 1996. In response to Berger's inquiry, McDermott represented that the liquid was just rainwater. Berger communicated that information to the engineers. In November, 1996, the engineers submitted a written report to the plaintiffs, telling them that the liquid was not just rainwater, but eight or more inches of oil and water and that the aboveground storage tanks in the basement of area M had been used. The plaintiffs presented no evidence that they sustained damages between the time of McDermott's October, 1996 representations and their receipt of the engineers' report in November, 1996. No prejudicial deadlines passed during that interval of time.

Berger knew that the oil had seeped into the concrete forming the basement in area M. He was not concerned about the oil in the concrete because the plaintiffs intended to remove the concrete. He was concerned that oil had been seeping into the soil. His complaint was not that the soil had to be remediated, because the reports from the engineers and Apex had disclosed that fact, but that the amount of remediation required was beyond what he had expected. The tests performed on

the plaintiffs' behalf, however, failed to disclose the amount of remediation required. The plaintiffs offered no evidence that McDermott or any of the defendants made any representations concerning the soil around the basement in area M. None of the engineers or Apex employees testified that they had relied on McDermott's representations to determine the amount of testing they had to do. The court concluded, therefore, on the basis of this court's decision in *Visconti* v. *Pepper Partners Ltd. Partnership*, 77 Conn. App. 675, 683–85, 825 A.2d 210 (2003), that a plaintiff's bare assertion that it had relied on the defendant's representation was of no probative value in the face of other evidence to the contrary.[23] The court also concluded that the "as is" and merger provisions of the agreement barred the breach of contract claim. See footnote 12.

After reviewing the record and the arguments of the parties, we agree with the court's view of the evidence, the applicable law and its reasoning. The plaintiffs argue

---

[23] Berger testified, in part, as follows on cross-examination:

"[The Defendants' Counsel]: And you said you relied on [what McDermott told you], not any of the other stuff that your experts are telling you. You relied on Mr. McDermott.

"[The Witness]: We relied on my experts as well.

\* \* \*

"[The Defendants' Counsel]: Now, prior to the closing, you had the [engineers'] report in your hands. Correct?

"[The Witness]: Yes.

"[The Defendants' Counsel]: In fact, it was about nine months before the closing. Right? Approximately?

"[The Witness]: We had the draft form, yes.

"[The Defendants' Counsel]: And that disclosed to you this 10,000 gallons of oil and water in the basement. Right? We talked about that before.

"[The Witness]: Yes.

"[The Defendants' Counsel]: And it also disclosed oil and water in one of the lift pits in area M. Correct?

"[The Witness]: Yes.

"[The Defendants' Counsel]: So, you were aware that there was a problem in the basement of area M when you got that report. Right?

"[The Witness]: We knew there was purportedly water and oil inside the basement of area M."

on appeal that *Holly Hill Holdings* v. *Lowman*, supra, 226 Conn. 748, does not apply because they alleged mistake and fraud. On the basis of our plenary review of the allegations of count one, we find no allegations of mistake or fraud. As we previously noted, material facts are those that will make a difference in the case, and they must be pleaded. Mistake and fraud were not pleaded in count one of the plaintiffs' amended complaint.

The plaintiffs also have argued that McDermott's representations made in October, 1996, and the defendants' failure to comply with the law pursuant to the compliance provision of the agreement induced them to enter into the agreement. There are no allegations to that effect in count one of the amended complaint. The plaintiffs have not brought to our attention any evidence of fraud or misrepresentation that induced them to enter into the agreement to purchase the premises. The evidence regarding misrepresentations referred to events that occurred after the plaintiffs had entered into the agreement to purchase the premises.

Our Supreme Court has held "that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth. . . . The governing principles are set forth in similar terms in § 552 of the Restatement Second of Torts (1977): One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. . . . Accordingly, an action for negligent misrepresentation requires a plaintiff to prove that (1) the defendant made a misrepresentation and (2) the plaintiff reasonably relied upon that misrepresentation.

. . . Whether evidence supports a claim of . . . negligent misrepresentation is a question of fact." (Emphasis in original; internal quotation marks omitted.) *Savings Bank of Manchester* v. *Ralion Financial Services, Inc.*, 91 Conn. App. 386, 389–90, 881 A.2d 1035 (2005).

In support of their position that they relied on McDermott's misrepresentations, the plaintiffs rely on *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996), citing *Warman* v. *Delaney*, 148 Conn. 469, 474, 172 A.2d 188 (1961),[24] for the proposition that "[i]n a claim for misrepresentation, a tort claim, a plaintiff is not seeking to add to or change the terms of the written contract itself, but is claiming inducement to enter into the contract by material misrepresentation of material facts." (Internal quotation marks omitted.) *Foley* v. *Huntington Co.*, supra, 721. The facts at issue in this case are distinguishable from *Foley*, in which this court stated that "[a] misrepresentation by a seller as to the boundaries of land to be sold, if made negligently or recklessly and relied upon by a buyer *without conducting an independent survey*, can support an award of damages even if the written contract constitutes the entire agreement of the parties and the contract specifically disclaims any representations of the seller as to the condition of the land and contains a contrary description of the land." (Emphasis added.) Id., 721–22.[25]

In this case, the plaintiffs retained two experts to conduct phase I and phase II environmental site assessments of the property, the factual equivalent of a survey. The plaintiffs here, unlike the plaintiffs in *Warman*, knew prior to the closing, on the basis of their experts'

---

[24] *Warman* v. *Delaney*, supra, 148 Conn. 469, involved fraudulent misrepresentation.

[25] In *Foley*, the defendant property owner represented the boundaries of the property prior to the plaintiffs' signing a contract to purchase the premises.

reports, that there was oil in the basement of area M and that the aboveground storage tanks had been used. Furthermore, the plaintiffs have not referred to any evidence that McDermott or any of the other defendants made a representation as to the condition of the soil surrounding the basement of area M. Berger assumed that the soil was contaminated because the oil had permeated the concrete forming the basement. It was not the fact that the soil was contaminated that was a problem, but the *amount of contamination.* There is no evidence that the defendants were in a position to know the extent of contamination, had made any representation as to that fact or prevented the plaintiffs from conducting the appropriate tests. Although Berger testified that the plaintiffs relied on their experts; see footnote 23; the plaintiffs' claim is that they relied on McDermott's misrepresentation.

The plaintiffs also argue that the defendants breached their contractual obligations by failing to inform them that they had permitted oil to collect in the basement of area M, which was in violation of the law.[26] Again, the plaintiffs, prior to closing, knew of the presence of the oil in the basement of area M on the basis of their experts' reports. For the foregoing reasons, the court properly directed a defendants' verdict on the breach

---

[26] The court addressed the plaintiffs' argument concerning the removal of aboveground oil storage tanks. Although the plaintiffs *did not explicitly plead it,* they claimed that the defendants breached the agreement by failing *to empty and remove the aboveground storage tanks on the property prior* to closing. McDermott admitted that the defendants had an obligation to clean and to decontaminate the tanks on the property, and there was evidence from which the jury could find that the defendants did not remove the tanks. The court concluded, however, that the plaintiffs could not prevail on the claim because § 4 (possession and condition of premises) of the agreement did not survive the closing. The defendants were deemed to have performed their obligations and were discharged therefrom by the closing. The fact that the plaintiffs did not plead their claim, a finding which they do not challenge, is sufficient for us to conclude that the court properly granted the motion for a directed verdict. Material facts must be pleaded.

of contract claim and denied the plaintiffs' motion to set aside the verdict.

## II

The plaintiffs claim that the court improperly directed a verdict as to their counts that alleged negligent and reckless misrepresentation. The court found that the plaintiffs had alleged five counts of misrepresentation, each asserting a different degree of culpability. The basis of all five counts of negligence was the same allegation of misrepresentation asserted in count one. The court concluded that there was no causal connection between McDermott's representations as to the nature of the liquid in the basement of area M and the plaintiffs' alleged loss.[27] The court further concluded that the plaintiffs' claimed reliance was not reasonably justifiable because the plaintiffs had contracted away their right to rely on any representation by the defendants. At the time the plaintiffs entered into the agreement, they agreed to the due diligence provision, that is, that they would rely on their own investigation of the premises and not on any representations made by the defendants, and that the plaintiffs had had an opportunity to examine all of the information necessary to complete an environmental site assessment and were satisfied with the results of that assessment. See footnote 9. In addition, in the second amendment to the agreement, the plaintiffs agreed pursuant to the inspec-

---

[27] The court stated in its memorandum of decision that "no reasonable person could find any justifiable reliance by the plaintiffs. The plaintiffs had the benefit of two companies with expertise in environmental assessment . . . . In addition, Berger was an expert in real estate development and had developed an adjacent property formerly used for automotive purposes. On the other had, there was no evidence that McDermott possessed any particular education or expertise whatsoever. He was not shown to be anything other than a well-groomed car salesman. While the reasonableness of reliance on a misrepresentation is ordinarily a question of fact, on this record no reasonable person could find that any reliance by the plaintiffs was reasonable or justified."

tion provision that they had thirty days in which to complete their environmental site assessment after which they agreed to hold the defendants harmless and indemnify them for all claims made on the basis of the environmental condition of the property. See footnote 7. We agree with the court.

Viewing the evidence in the light most favorable to the plaintiffs, the court found that a reasonable person might believe that most of the oil in the basement of area M and the surrounding soil got there during the time that the defendants owned the property. A reasonable person also might believe that McDermott, when asked about the liquid in the basement, knew or should have known that it was not just rainwater, but also oil waste. Regardless, the plaintiffs could not prevail on their claims of misrepresentation and fraud because each claim required them to prove that they reasonably or justifiably relied on McDermott's statement concerning rainwater. The court reviewed the contents of and quoted from the engineers' written environmental assessment, in particular those portions concerning area M. The environmental assessment recommended to the plaintiffs that the waste generated at area M should be assessed.

## A

In directing the jury's verdict as to the claims of misrepresentation, the court relied on *Visconti* v. *Pepper Partners Ltd. Partnership*, supra, 77 Conn. App. 675,[28] an appeal from the rendering of summary judgment in favor of the defendants.[29] In *Visconti*, the plaintiff purchased real property that he knew had been used

---

[28] In *Visconti*, the misrepresentation and fraud related to representations made pursuant to the Hazardous Waste Transfer Act, General Statutes § 22a-134 et. seq.

[29] The test for granting a motion for summary judgment is whether a party is entitled to a directed verdict. *O'Connor* v. *Board of Education*, 90 Conn. App. 59, 67, 877 A.2d 860, cert. denied, 275 Conn. 912, 882 A.2d 675 (2005).

as a gasoline station and automobile repair shop, and where three underground gasoline storage tanks and one waste oil storage tank had been removed. Id., 678–79. According to the prior owner, contaminated soil near the tanks also had been removed, and the authorities were satisfied. Id. The contract for sale advised the plaintiff that the property might be a hazardous waste establishment and permitted him to conduct a phase I environmental site assessment. Id., 679. The plaintiff agreed to sign transfer act forms stating the environmental history of the property and to be responsible for the cost of environmental remediation. Id., 680. The plaintiff did not perform a preclosing environmental assessment. Id. The plaintiff testified at a deposition that "he assumed that the soil around the tank area was contaminated." Id., 679. The plaintiff's complaint alleged, in part, fraud, fraudulent nondisclosure and negligent misrepresentation. Id., 677.

The trial court in *Visconti* granted the defendants' motion for summary judgment as to the fraud and misrepresentation claims, concluding that the plaintiff "had not alleged material facts to sustain his claim of fraud because, even if [the prior owner] had been untruthful in representing that the . . . cleanup had satisfied the relevant authorities, the plaintiff had not relied on that representation to establish that the property was not contaminated. . . . [A]lleging fraudulent nondisclosure, was untenable in light of the provisions in the contact of sale that assigned the risk of environmental hazards to the plaintiff." Id., 681. For the same reason, the count of negligent misrepresentation could not succeed. Id. This court affirmed the trial court's judgment because the plaintiff had assumed the environmental risk when he entered into the contract for sale; id., 683, 685; and had had the opportunity to investigate the site before closing. Id., 686. Under the circumstances, the

defendants owed no further duty to make disclosures. Id.

In addressing the plaintiffs' arguments in their motion to set aside the directed verdict, the court in this case quoted *Visconti*: "Proving a false representation is . . . only one part of a claim of actionable misrepresentation. To prevail, the plaintiff also was required to show that he reasonably relied on that misrepresentation. One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Emphasis in original; internal quotation marks omitted.) Id., 682–83.

The court concluded with respect to the misrepresentation counts, as it did with regard to the misrepresentation aspect of the breach of contract count, that no reasonable person could find that the plaintiffs had relied on any representations made by the defendants. Furthermore, no reasonable person could find that the plaintiffs' alleged reliance on the representations of the defendants was justified. Pursuant to the agreement, the plaintiffs assumed the risk that the property contained environmental waste when they took the deed and bill of sale. They knew for many months prior to the closing that there was a pool of oil in the basement of area M.

In addition, the court concluded that the plaintiffs had contracted away their right to rely on any representation by the defendants as to the environmental condition of the property. The plaintiffs agreed to purchase the property "as is." See footnote 12. At the time they entered into the agreement, the plaintiffs agreed that they were relying on their own investigation of the premises, not on McDermott's representations. Further-

more, the plaintiffs had the opportunity to examine and to review any and all information necessary to complete the environmental site assessments. The plaintiffs were satisfied with the results of their investigation. Pursuant to the second amended agreement of May, 1996, the plaintiffs had thirty days in which to conduct an environmental site assessment after which they would hold the defendants harmless and indemnify them for all claims made on the basis of the environmental condition of the property. Finally, the plaintiffs' acceptance of the deed constituted full performance by the defendants of all of their obligations under the agreement.

### B

The plaintiffs claim that the court improperly directed a verdict in favor of the defendants on their counts of fraudulent and intentional misrepresentation. There is no support for this claim.

"Fraud consists [of] deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. . . . Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as clear and satisfactory or clear, precise and unequivocal. . . . The determination of what acts constitute fraud is a question of fact . . . ." (Citation omitted; internal quotation marks omitted.) *Miller* v. *Guimaraes*, 78 Conn. App. 760, 780–81, 829 A.2d 422 (2003).

Again, even if we were to assume, without deciding, that the plaintiffs had proved by the higher standard of proof that McDermott knew that the liquid in the basement of area M contained oil and that he made the statement with the intent to induce the plaintiffs to purchase the subject premises, we agree with the court's characterization that Berger's testimony as to reliance is fanciful. He communicated McDermott's representation to the engineers and testified that he relied on his experts. Apex conducted soil borings and subslab tests subsequent to October, 1996.

More importantly, McDermott's misrepresentation and the defendants' failure to disclose letters from the department were not material to the plaintiffs' loss. "In equity, as in law, misrepresentation, to constitute fraud, must be material. . . . That is to say, the representation must prejudice the party relying upon it." (Internal quotation marks omitted.) *Morgera* v. *Chiappardi*, 74 Conn. App. 442, 458, 813 A.2d 89 (2003). The plaintiffs' claim of damages concerns the expense and consequential damages that flowed from the remediation of the soil surrounding the basement of area M. McDermott made no representations as to the soil, and the letters to the defendants from the department did not concern area M or the soil surrounding it. For those reasons, the court properly granted the defendants' motion for a directed verdict as to the plaintiffs' claim of intentional and fraudulent misrepresentation.

### III

The plaintiffs claim that the court improperly directed a verdict in favor of the defendants with regard to the CUTPA claim, which was based on the defendants' misrepresentations and failure to disclose the letters from the department. We disagree.

The court addressed the plaintiffs' CUTPA count in more detail in its memorandum of decision on the

motion to set aside the directed verdict. The court based its decision on the "as is" provision of the agreement and that the defendants had not relied on McDermott's representations. The court concluded again that McDermott's misrepresentation was not the proximate cause of the plaintiffs' loss. "Where a plaintiff alleges that a defendant's *passive* conduct violates CUTPA . . . common sense dictates that a court should inquire whether the defendant was under any obligation to do what it refrained from doing." (Emphasis in original.) *Downes-Patterson Corp.* v. *First National Supermarkets, Inc.*, 64 Conn. App. 417, 427, 780 A.2d 967, cert. granted on other grounds, 258 Conn. 917, 782 A.2d 1242 (2001) (appeal dismissed June 25, 2002). Furthermore, to prove a violation of CUTPA, the plaintiffs were required to show that the defendants' alleged misrepresentation was the proximate cause of their injury. See *Abrahams* v. *Young & Rubicam, Inc.*, 240 Conn. 300, 306, 692 A.2d 709 (1997).

"It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . .

"To establish a CUTPA violation, a claimant's evidence must establish that the conduct at issue falls within one of three criteria. A court must decide whether the conduct (1) offends public policy, (2) is immoral, unethical, oppressive or unscrupulous or (3) causes substantial injury to consumers, competitors or other businessmen." (Citations omitted; internal quotation marks omitted.) *Russell* v. *Russell*, 91 Conn. App.

619, 646, 882 A.2d 98, cert. denied, 276 Conn. 924, 925, 888 A.2d 92 (2005). "Whether the defendant is subject to CUTPA is *a question of law*, not fact." (Emphasis added; internal quotation marks omitted.) *Muniz* v. *Kravis*, 59 Conn. App. 704, 712, 757 A.2d 1207 (2000), quoting *Connelly* v. *Housing Authority*, 213 Conn. 354, 364–65, 567 A.2d 1212 (1990).

On appeal, although the plaintiffs argue that the sale of real property is protected commerce pursuant to § 42-110a (4), the defendants argue that to constitute a violation of CUTPA, the alleged offense must arise out of the offenders' primary trade or business, not out of an incidental matter.[30] The record is replete with evidence that the defendants were in the business of selling automobiles and providing related automotive services. The plaintiffs do not challenge those facts or that the sale of the premises was not the defendants' primary trade or business. The question of whether a CUTPA claim may arise out of a transaction that is not the alleged offender's primary trade or business has not been addressed by Connecticut's appellate courts. The federal district courts in the district of Connecticut, however, have addressed the question. See *Cornerstone Realty, Inc.* v. *Dresser Rand Co.*, 993 F. Sup. 107, 111–12 (D. Conn. 1998) (rule 12 (b) (6) motion to dismiss); *Arawana Mills Co.* v. *United Technologies Corp.*, 795 F. Sup. 1238 (D. Conn. 1992) (same).

In both *Cornerstone Realty, Inc.*, and *Arawana Mills Co.*, the plaintiffs sought damages due to environmental contamination they discovered on the premises of real property they intended to purchase or had leased. The defendants in both cases sought, pursuant to rule 12 (b) (6) of the Federal Rules of Civil Procedure, to dis-

---

[30] Although the court did not address that question and neither of the parties sought an articulation, we will review the claim pursuant to the supervisory powers granted us by our rules of practice in order that justice may be done. See Practice Book §§ 60-1, 60-2.

miss the CUTPA claims against them because their primary trade or commerce did not concern real estate. The defendants in *Cornerstone Realty, Inc.*, were manufacturing and industrial companies. The defendant in *Arawana Mills Co.* was in the business of repairing and servicing aircraft engines. *Cornerstone Realty, Inc.* v. *Dresser Rand Co.*, supra, 993 F. Sup. 111–12. In both cases, the courts dismissed the CUPTA allegations because the sale or lease of real property was not the defendants' primary trade or commerce.

When ruling on the motion to dismiss in *Cornerstone Realty, Inc.*, the court reasoned that it would have to predict how our Supreme Court would rule on the case. It looked to *Sealy Connecticut, Inc.* v. *Litton Industries, Inc.*, 989 F. Sup. 120 (D. Conn. 1997), in which "the plaintiff claimed that the defendant violated CUTPA by allegedly contaminating certain property it had leased from the plaintiff and then concealing from the plaintiff the extent of environmental contamination. The court [in *Sealy Connecticut, Inc.*] noted that the claim encompassed the allegations of concealment, but reasoned that the key question is whether leasing property is defendant's trade or commence. . . . Following the holding of *Arawana Mills* [*Co.*], the court dismissed the CUTPA claim. . . . See also *Brandewiede* v. *Emery Worldwide*, 890 F. [Sup.] 79, 81 (D. Conn. 1994) (no viable claim under CUTPA for conduct in leasing aircraft where leasing aircraft was incidental to defendant's primary business of providing overnight freight service) . . . [aff'd, 66 F.3d 308 (2d Cir. 1995)]." (Citations omitted; internal quotation marks omitted.) *Cornerstone Realty, Inc.* v. *Dresser Rand Co.*, supra, 993 F. Sup. 112. The court also cited numerous Superior Court cases in which it was held that environmental contamination, even when concealed, was not actionable if it was incidental to the primary trade or business of the defendant. Id., 112–13.

Our legislature is presumed to be aware of judgments that construe our statutes. In the absence of any legislation to reverse the courts' decisions, we may assume that the General Assembly is in agreement with them. See *Labadie* v. *Norwalk Rehabilitation Services, Inc.*, 274 Conn. 219, 235 n.11, 875 A.2d 485 (2005). We accordingly conclude that a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce.

Because the defendants in this case were not in the business of selling real property, and the purchase and sale agreement at issue was merely incidental to the defendants' sale and servicing of automobiles, we conclude that the court properly directed a verdict as to the plaintiffs' CUTPA count.

## IV

The plaintiffs next claim that the court improperly directed a verdict as to their counts of common-law indemnification and statutory indemnification. The plaintiffs alleged that the defendants breached the agreement by failing to abide by the laws of the state of Connecticut and that their failure to do so obligated the plaintiffs to pay expenses, fines and legal fees. The court found both claims unavailing. We agree.

## A

In essence, the court based its decision as to common-law indemnification on the allegations of the amended complaint, the "as is" provision of the agreement and the doctrine of active-passive negligence. Common-law indemnification "imposes an implied obligation of indemnity on a tortfeasor whose *active* negligence is primarily responsible for a plaintiff's injuries, thus superseding the indemnitee's *passive* negligence. . . . To assert a claim for indemnification . . . an out-of-pocket defendant must show that: (1)

the party against whom the indemnification is sought was negligent; (2) that party's active negligence, rather than the defendant's own passive negligence, was the direct, immediate cause of the . . . resulting injuries . . . (3) the other party was in control of the situation to the exclusion of the defendant seeking reimbursement; and (4) the defendant did not know of the other party's negligence, had no reason to anticipate it, and reasonably could rely on the other party not to be negligent." (Citation omitted; emphasis in original.) *Smith* v. *New Haven*, 258 Conn. 56, 66, 779 A.2d 104 (2001).[31]

The court concluded that because the plaintiffs purchased the property "as is," they could not meet the second element of the cause of action, which was that the defendants' active negligence was the cause of their loss. See footnote 12 ("buyer acknowledges that it has examined the premises agreed to be sold and is buying them 'as is', without warranty or representation of any kind whatsoever, whether relating to the premises' condition or use, express or implied, by . . . sellers not expressly stated herein"). In addition, the defendants were not in exclusive control of the situation, which is the third element, because the plaintiffs investigated the environmental condition of the property. And last, the plaintiffs knew of the condition in the basement of area M nine months before the closing because it was discovered and investigated by the engineers. We agree with the court's analysis.

Count six of the amended complaint alleged, in part, that "as a result of " the defendants' various breaches of the agreement and failure to abide by Connecticut environmental law, the plaintiffs were obligated to pay certain expenses. The "as a result of" language required

---

[31] Pursuant to our plenary review of count six, we conclude, as a matter of law, that the amended complaint did not allege any of the elements of common-law indemnification.

that the plaintiffs' loss be proximately caused by the defendants' wrongful conduct. *Haesche* v. *Kissner*, 229 Conn. 213, 223–24, 640 A.2d 89 (1994). As has been discussed at length in this opinion, the court properly concluded that the defendants' wrongful conduct was not the proximate cause of the plaintiffs' loss. The plaintiffs were aware of the contaminated soil, but they failed to discover the extent of the contamination.

B

Count seven of the amended complaint sought indemnification pursuant to § 22a-452.[32] The court concluded that the count was barred by the parties' agreement pursuant to *Visconti* v. *Pepper Partners Ltd. Partnership*, supra, 77 Conn. App. 675. When the plaintiffs closed on the agreement, they knew that the property had a history of being used for automobile related purposes and that the soil would reflect that use. Nine months before the closing, the plaintiffs were informed that the basement in area M contained 10,000 gallons of oil and water and that the liquid had stained the concrete. The tests that the plaintiffs' experts performed failed to detect the extent of oil contamination in the soil. In any event, pursuant to the § 7.3 of the agreement, the plaintiffs assumed the risk of such contamination and did so for more than three years after the closing, when the department discovered the problem.

---

[32] General Statutes § 22a-452 (a) provides in relevant part: "Any person, firm, corporation or municipality which contains or removes or otherwise mitigates the effects of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes resulting from any discharge, spillage, uncontrolled loss, seepage or filtration of such substance or material or waste shall be entitled to reimbursement from any person, firm or corporation for the reasonable costs expended for such containment, removal, or mitigation, if such oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes pollution or contamination or other emergency resulted from the negligence or other actions of such person, firm or corporation. . . ."

Although § 22a-452 may have provided a remedy for indemnification for the cost of remediating the soil, the plaintiffs negotiated away that statutory right. See *Holly Hill Holdings* v. *Lowman*, supra, 226 Conn. 755 ("parties are free to contract for whatever terms on which they may agree"). On the basis of the facts, the law and the agreement, the plaintiffs are unable to place liability for the remediation of the soil on the defendants.

V

The plaintiffs claim that the court usurped the authority of the jury in violation of their constitutional right to a jury trial,[33] misapplied the doctrine of merger as to their claims of misrepresentation and applied the incorrect statute of limitations regarding their claims of indemnification.[34] The plaintiffs failed to raise their constitutional and merger claims in their motion to set aside the directed verdict. "It is well settled that the

---

[33] If the plaintiffs' claim of usurping the province of the jury were to carry any weight, there would be no need for our rule of practice, Practice Book § 16-37, which permits a directed verdict when "the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Internal quotation marks omitted.) *Robinson* v. *Galino*, supra, 275 Conn. 297. In essence, the plaintiffs' argument is that the jury should have been permitted to determine whether they relied on McDermott's representation as to the liquid in the basement. On the basis of our review of the amended complaint, the evidence, the law and the court's memorandum of decision, we conclude that there was insufficient evidence from which a reasonable person could have concluded that the defendants' misrepresentations were the proximate cause of the plaintiffs' alleged injuries. Even if they had been the proximate cause, the plaintiffs got the benefit of their bargain by agreeing to purchase the property "as is," inspect the premises and hold the defendants harmless, among other things that may not have been in their best interest.

[34] In their brief on appeal, the plaintiffs represented that in its "memorandum of decision dated February 17, 2005, the court does not discuss [its] rulings regarding the previously raised issue of the statute of limitations in environmental indemnification claims." The plaintiffs failed to file a motion for articulation. The record, therefore, is inadequate for our review. See Practice Book § 61-10; *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232, 828 A.2d 64 (2003).

trial court can be expected to rule only on those matters that are put before it. . . . With only a few exceptions . . . we will not decide an appeal on an issue that was not raised before the trial court. . . . To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *Merritt* v. *Fagan*, 78 Conn. App. 590, 600–601, 828 A.2d 685, cert. denied, 266 Conn. 916, 833 A.2d 467 (2003).

The judgment is affirmed.[35]

In this opinion the other judges concurred.

---

[35] The plaintiffs also claim that the court improperly directed a verdict as to their counts of fraudulent concealment and fraud. Their arguments fail for the reasons stated in the analysis of their fraudulent misrepresentation claim. No useful purpose could be served by restating our analysis, which would accomplish no more than lengthening an already overly long opinion. The plaintiffs knew of the oil in the basement of area M and were aware that the soil was contaminated before they closed the transaction. More importantly, the plaintiffs bargained for the right to purchase the property "as is." See *Gibson* v. *Capano*, 241 Conn. 725, 734, 699 A.2d 68 (1997) (where party realizes it has only limited information about subject of contract, but treats that knowledge as sufficient in making contract, it is deemed to have assumed risk of mistake).