# EDWARD A. VISCONTI, JR., ET AL. *v.* PEPPER PARTNERS LIMITED PARTNERSHIP ET AL.
## (AC 23329)

Lavery, C. J., and Dranginis and Peters, Js.

Argued May 1—officially released July 1, 2003

*Jonathan A. Kocienda*, with whom, on the brief, was *Elizabeth Fairbanks Flynn*, for the appellants (plaintiffs).

*David P. Friedman*, with whom was *Marcy Tench Stovall*, for the appellees (defendants).

*Opinion*

PETERS, J. When there is a sale of real property that may be environmentally contaminated, the Hazardous Waste Transfer Act (Transfer Act), General Statutes § 22a-134 et seq., requires a transferor either to provide to a transferee a negative declaration to indicate that the property poses no environmental threat or to certify to the department of environmental protection that remediation measures will be undertaken. In this case, the contract for the sale of the property provided that the transferee would take the risk of environmental contamination and bear the cost of whatever remediation might be necessary. The principal issue is whether these express provisions should be set aside because they resulted from fraudulent misrepresentation or nondisclosure. Concluding that the plaintiff transferee had failed to allege sufficient facts to demonstrate fraudu-

lent misconduct, the trial court granted a motion for summary judgment filed by the defendant transferors. We affirm the judgment of the trial court.

The plaintiff, Edward A. Visconti, Jr.,[1] filed a twelve count complaint seeking damages and injunctive relief[2] from the defendants, Pepper Partners Limited Partnership (Pepper Partners), Ernest A. Wiehl, Jr. (Ernest Wiehl), Richard V. Wiehl and Consumer Petroleum of Connecticut, Inc.[3] Only four of these counts are before us on this appeal. These counts allege fraud (count one), fraudulent nondisclosure (count two), negligent misrepresentation (count seven) and breach of duty to remediate (count eleven).[4] The plaintiff claimed that he was entitled to monetary and injunctive relief and to a declaratory judgment requiring the defendants to remediate all environmental contamination on the property and to reimburse him for the reasonable costs that he had incurred for the containment, removal or mitigation of such environmental contamination.

[1] The complaint lists the following as additional plaintiffs: Edward A. Visconti, Jr., doing business as E. A. Visconti and Sons, otherwise known as Visconti and Sons; Surrogate Wheels of Milford, Inc.; and Auto Specialists of Milford, LLC. Because these additional plaintiffs apparently have raised no separate claims of wrongdoing, we will refer to the named plaintiff, Edward A. Visconti, Jr., as the plaintiff.

[2] This case is one of three related cases. The others are a foreclosure action brought by Pepper Partners against the plaintiff and a legal malpractice action brought by the plaintiff against his former attorney, Thomas B. Lynch.

[3] Ernest A. Wiehl, Jr., was the owner of 99 percent of Pepper Partners, with his wife holding the remaining 1 percent interest. Ernest Wiehl and his son, Richard V. Wiehl, owned Consumer Petroleum of Connecticut, Inc., which supplied petroleum products to tenants on the property from 1978 to 1988.

[4] The other counts alleged fraudulent prevention of inquiry (count three), conspiracy (count four), breach of covenant of good faith (count five), breach of contract (count six), negligence (count eight); negligence per se (count nine), and violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. (count twelve). Count twelve was not before the trial court, *McWeeny, J.*, because it had earlier been stricken by the court, *Curran, J.*

The defendants denied the material allegations in the plaintiff's complaint and filed a number of special defenses. The most significant of these special defenses asserted that the plaintiff's claims were barred by the terms of the contract of sale of the property and by applicable statutes of limitation. The defendants also filed a counterclaim based on an indemnity provision in the contract of sale.

The defendants moved for summary judgment on the complaint, but not on the counterclaim. Despite the plaintiff's objection, the court granted the motion for summary judgment.

The record and the court's memorandum of decision set out the relevant undisputed facts. On February 9, 1996, the plaintiff bought property located at 199-211 Naugatuck Avenue, Milford, from the defendant Pepper Partners by quitclaim deed. At that time, the property was vacant but, as the plaintiff knew, a gasoline station and an automobile repair shop previously had been located there. The plaintiff had worked at the gasoline station at an earlier time.

In 1988, as a result of an order of abatement issued by the city of Milford, Ernest Wiehl had three underground gasoline tanks and one waste oil storage tank removed from the property. At the same time, he had the contaminated soil in the vicinity of the tanks removed and replaced by clean fill.

In 1989, Ernest Wiehl quitclaimed his ownership in the property to Pepper Partners. The property lay idle until the plaintiff purchased it in 1996.

In 1995, observing that the property was for sale, the plaintiff visited the site in the company of a real estate agent representing Ernest Wiehl. The agent told the plaintiff, and Ernest Wiehl subsequently confirmed, that the underground tanks had been removed and that the

authorities were satisfied. The plaintiff observed the difference in the soil where the tanks had been removed and new fill had been brought in.

In his deposition, the plaintiff acknowledged that, after the site visit, he assumed that the soil around the tank area was contaminated. None of the defendants ever told him that the soil was environmentally clean. None of the defendants ever told him not to have the soil tested to discover whether it was contaminated.

Later in 1995, the plaintiff and Pepper Partners entered into negotiations for the conveyance of the property to the plaintiff. Throughout, the plaintiff was represented by counsel of his choice.

Under the terms of the contract of sale that the plaintiff executed in January, 1996, the plaintiff agreed to purchase the property for a down payment of $5000 and to execute a mortgage note to Pepper Partners for $200,000. At the closing on February 9, 1996, the plaintiff made the down payment and executed the mortgage and the note. He has not made any further payments since that time.

The contract of sale specifically addressed the environmental concerns raised by the hazardous waste generated by the use of the property as a gas station and an automobile repair shop in the 1980s. The contract provided that the plaintiff, at his own expense, would "make such inspections of the Premises (including without limitation a Phase I environmental site assessment)" as the plaintiff deemed appropriate. The contract advised the plaintiff that the property might fall within the definition of a hazardous waste "establishment"[5] that would require environmental remediation. It placed

[5] General Statutes § 22a-134 regulates the transfer of a hazardous waste establishment. Pursuant to § 22a-134 (3) (E), property that, after 1967, has been used as a vehicle repair shop or a vehicle painting shop, is an "establishment."

on the plaintiff the burden of executing the requisite environmental certifications,[6] of paying the accompanying filing fees and of taking responsibility for any needed environmental testing and cleanup.

Prior to the closing, Pepper Partners reminded the plaintiff of his environmental obligations. Pepper Partners indicated its willingness to postpone the closing until the plaintiff had undertaken an environmental study of the property and to release the plaintiff from the contract of sale in the event that the study dissuaded the plaintiff from proceeding further. Pepper Partners insisted, however, that it would not convey the property without the plaintiff's signing and filing of the required Transfer Act forms. To this end, Pepper Partners provided the necessary forms to the plaintiff, stating therein the environmental history of the property's prior use as an automobile repair shop. In the contract of sale, the plaintiff acknowledged that Pepper Partners had made no representations about the environmental condition of the property except to inform the plaintiff that the property might be an environmental "establishment" because of its prior use as a service station.

The plaintiff declined to perform a preclosing environmental examination of the property and signed and filed the Transfer Act forms, without additions or deletions, as they had been prepared by Pepper Partners.[7]

---

[6] General Statutes § 22a-134a provides that two forms must be filed upon the transfer of an "establishment." One is an environmental condition assessment form (ECAF), which describes the condition of the property at the time of the transfer, and the other is a property transfer program—form III, which requires the party filing the ECAF to take responsibility for any environmental pollution of the property.

[7] In the environmental condition assessment form, the plaintiff, as the person filing the form, acknowledged that he had indicated no environmental assessment of the property. In the property transfer program—form III, the plaintiff indicated that the form was being filed because "until approximately 1983, the property was used as an auto body shop." He certified that he would investigate the property to determine whether it posed a threat to the environment and agreed to remediate any environmental hazard that he might discover.

On February 5, 1996, the plaintiff advised Pepper Partners that he was anxious to close the sale as early as possible. The closing took place on February 9, 1996.[8]

The trial court granted the motion of the defendants for summary judgment on all counts of the plaintiff's complaint. It concluded, in relevant part, that the plaintiff, in count one, had not alleged material facts to sustain his claim of fraud because, even if Ernest Wiehl had been untruthful in representing that the 1988 cleanup had satisfied the relevant authorities, the plaintiff had not relied on that representation to establish that the property was not contaminated. It further held that count two, alleging fraudulent nondisclosure, was untenable in light of the provisions in the contract of sale that assigned the risk of environmental hazards to the plaintiff. It determined that the plaintiff could not succeed in count seven, alleging negligent misrepresentation, for the same reason that it could not succeed on the fraud count. Finally, the court held that the statute of limitations barred the plaintiff's statutory claim in count eleven to recover for environmental damage. In this appeal, the plaintiff challenges the validity of each of these conclusions.

We review the granting of a motion for summary judgment according to a well-established standard. "Pursuant to Practice Book § 17-49, summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving

---

[8] At several junctures, the plaintiff alleges that he is not bound by the contract and the forms that he signed because he was functionally illiterate. He acted throughout the negotiations on the advice of counsel of his choice. He has not claimed that the contract was unconscionable. The record makes it abundantly clear that the defendants did not pressure the plaintiff into signing the contract at any particular time. Under these circumstances, the plaintiff's consent to the terms of the sales contract cannot be impeached on the ground of illiteracy. See *Goldberg* v. *Krayeske*, 102 Conn. 137, 140–41, 128 A. 27 (1925).

party is entitled to judgment as a matter of law. Such questions of law are subject to plenary appellate review. . . . In deciding whether the trial court properly determined that there was no genuine issue of material fact, we review the evidence in the light most favorable to the nonmoving party." (Citation omitted; internal quotation marks omitted.) *Faigel* v. *Fairfield University*, 75 Conn. App. 37, 39–40, 815 A.2d 140 (2003); see also *Mytych* v. *May Dept. Stores Co.*, 260 Conn. 152, 158–59, 793 A.2d 1068 (2002).

# I

## NEGLIGENT OR FRAUDULENT MISREPRESENTATION

The plaintiff's claims for negligent misrepresentation (count seven) and fraud (count one) focus on the statement made to the plaintiff by Ernest Wiehl, which informed the plaintiff that, after the 1988 removal of underground tanks from the property that the plaintiff subsequently purchased, "the authorities were satisfied." The trial court held that this statement "might equal a false representation."[9]

The plaintiff emphasizes the importance of a false representation to a claim of negligent misrepresentation. Proving a false representation is, however, only one part of a claim of actionable misrepresentation. To prevail, the plaintiff also was required to show that he reasonably relied on that misrepresentation. "One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or commu-

---

[9] In a supplemental order, the court stated: "There is no evidence of misrepresentation."

nicating the information." (Emphasis added; internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 575, 657 A.2d 212 (1995); *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 218, 520 A.2d 217 (1987); *Giametti* v. *Inspections, Inc.*, 76 Conn. App. 352, 363–64, 842 A.2d 1 (2003); 3 Restatement (Second) Torts § 552, pp. 126–27 (1977).

The requirement of reliance applies also to an action for fraud. "The essential elements of an action in common law fraud . . . are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party *did so act upon that false representation to his injury.*" (Emphasis added; internal quotation marks omitted.) *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 260 Conn. 766, 777, 802 A.2d 44 (2002), quoting *Barbara Weisman, Trustee* v. *Kaspar*, 233 Conn. 531, 539, 661 A.2d 530 (1995); see also *Citino* v. *Redevelopment Agency*, 51 Conn. App. 262, 275, 721 A.2d 1197 (1998).

To prevail, therefore, the plaintiff must have alleged sufficient facts to demonstrate his reliance on the statement made by Ernest Wiehl. He has failed to do so. In his deposition, he acknowledged his independent knowledge of continued soil contamination, derived from his observation of differences in the color of the soil at the site of the removal of the storage tanks. In the contract of sale, he acknowledged that the property might be an environmental "establishment" and undertook to investigate and disclose the environmental condition of the property. In the mortgage, he again acknowledged that he had assumed the responsibility for remediating any environmental hazards that the property might contain. In light of these specific assertions of assumption of risk, the trial court properly

found no probative value in the plaintiff's bare statements that he had relied on Wiehl's representation.

## II

## FRAUDULENT NONDISCLOSURE

The plaintiff's claim of fraudulent nondisclosure, in count two of his complaint, arises out of the fact that, in 1989, when the property was transferred to Pepper Partners, the defendants did not comply with the reporting provisions of the Transfer Act. That failure came to light on May 22, 2000, when the department of environmental protection issued a notice of violation to Ernest Wiehl. The notice informed him that "contamination existed on this parcel prior to the transfer" because of the former use of the property as an auto body repair shop.

The plaintiff maintains that the defendants' failure to comply with the Transfer Act in 1989 was, in effect, an assertion that the property contained nothing that would give rise to any environmental concern. Had the defendants made the proper filings, *they* would have had to undertake the required environmental cleanup. Instead, he argues, having failed to comply with the Transfer Act, they fraudulently transferred contaminated property to him.

The plaintiff does not dispute the fact that, in the contract of sale of the property to him, he expressly undertook to take whatever steps for remediation the property might require. He recognizes that in *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 628 A.2d 1298 (1993), our Supreme Court held that contractual provisions may preclude "a private right of action . . . based on a transferor's noncompliance with pretransfer disclosure regulations." Id., 750. In that case, as in this one, the transferee "had actual knowledge of the existing underground gasoline storage tanks . . . that

were associated with the service station." Id., 751. Further, as in this case, the transferor had not given the transferee or the department of environmental protection the written notification contemplated by the applicable environmental statute. Id.; see also Regs., Conn. State Agencies § 22a-449 (d)-1 (d) and (f) (1).[10]

The plaintiff would have us distinguish this case from *Holly Hill Holdings* on the ground that he was unaware of the environmental hazards posed by the property. That argument is untenable. His deposition discloses that he knew the soil near the removed tanks to be contaminated even after removal of the tanks themselves.

The unassailable fact is that, in the contract of sale, the plaintiff assumed the risk that the property might have environmental problems when he purchased it.

---

[10] Section 22a-449 (d)-1 (d) of the Regulations of Connecticut State Agencies provides in relevant part: "(1) By May 8, 1986, the owner or operator of each existing facility shall notify the commissioner and the office of the local fire marshal of the results of the life expectancy determination required by subsection (h).

"(2) Within thirty days following completion of installation of a new facility an owner or operator shall notify the commissioner and the office of the local fire marshal of the results of the life expectancy determination required by subsection (h).

"(3) The notification required by subdivisions (1) and (2) of this subsection shall include but not be limited to the following: facility location and capacity, date of installation, contents, type of facility, and type of monitoring systems, if any, results of life expectancy determinations, and any other information which the commissioner deems necessary.

"(4) By May 8, 1986, the owner or operator of an abandoned or temporarily out-of-service facility shall notify the commissioner of the location, type and capacity of such facility and the date it was abandoned or removed from service. . . ."

Section 22a-449 (d)-1 (f) (1) of the Regulations of Connecticut State Agencies provides: "No owner or operator shall transfer ownership, possession or control of any new or existing facility without full disclosure to the transferee of the status of the facility with respect to compliance with these regulations at least fifteen (15) days prior to the transfer. Such disclosure shall include an up-to-date copy of the information submitted to the commissioner pursuant to subsection (d)."

He had the opportunity to investigate possible environmental hazards before the transfer of the property but chose not to make the relevant inquiries. We agree with the trial court that, under these circumstances, the defendants had no duty to make any further disclosures to the plaintiff. See *Kenney* v. *Healey Ford-Lincoln-Mercury, Inc.*, 53 Conn. App. 327, 332–33, 730 A.2d 115 (1999); 3 Restatement (Second), supra, § 551 (2) (e), comment (j), p. 123.

## III

### VIOLATION OF GENERAL STATUTES § 22a-16

In his final claim before this court, the plaintiff claims that he is entitled to a remedy under General Statutes § 22a-16,[11] which authorizes "any person" to bring an action "for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ." Tracking the language of the statute, the plaintiff, in count eleven of his complaint, alleged that the defendants' actions in causing the environmental contamination of his property "unreasonably polluted, impaired, or destroyed the public trust in the water and/or natural resources of the state of Connecticut."

In one of their special defenses, the defendants asserted that this claim was barred by the statute of

---

[11] General Statutes § 22a-16 provides in relevant part: "[A]ny person . . . or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business . . . for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction provided no such action shall be maintained against the state for pollution of real property acquired by the state under subsection (e) of section 22a-133m, where the spill or discharge which caused the pollution occurred prior to the acquisition of the property by the state."

limitations contained in General Statutes § 52-577. That statute requires an action "founded upon a tort" to be brought "within three years from the date of the act or omission complained of." The plaintiff does not dispute the applicability of this statute in this case.

The trial court agreed with the defendants that the plaintiff's statutory claim was time barred. In response to the plaintiff's motion for reconsideration, it stated that "[c]ount [e]leven is subject to § 52-577, an 'occurrence statute.' The property was vacant and unused since 1989." The court declined to accept the plaintiff's argument that the statute did not begin to run until the sale of the property to him.

The plaintiff's argument on appeal focuses on the fact that the defendants continued to own the polluted property after it had been vacated. According to the plaintiff, the defendants had a continuing duty to remediate the pollution caused by the former use of the property as a gasoline station and an automobile repair shop. The department of environmental protection apparently takes the same view. In May, 2000, the department notified Pepper Partners that the partnership should have complied with the requirements of the Transfer Act in 1989, when it acquired the property from Ernest Wiehl. The notice advised Pepper Partners to file the requisite environmental condition assessment form and a property transfer program—form III[12] within thirty days.

According to the plaintiff, Pepper Partners' failure to comply with their continuing duty to remediate the environmental pollution on their property was a continuing breach of duty that was actionable until his purchase of the property in 1998. This argument raises a question of first impression.

[12] See footnote 6.

The defendants argue, as the trial court held, that the plaintiff's analysis is flawed because, under § 52-577, the clock starts running on the date of the act or omission of which the plaintiff complains. *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 212, 541 A.2d 472 (1988); *S.M.S. Textile Mills, Inc.* v. *Brown, Jacobson, Tillinghast, Lahan & King, P.C.*, 32 Conn. App. 786, 790–91, 631 A.2d 340, cert. denied, 228 Conn. 903, 634 A.2d 296 (1993). The plaintiff has not challenged that proposition.

The question that must yet be answered, however, is whether a failure to remediate pollution of which the defendants were aware is an "omission" that continues to be actionable as long as it continues to exist. The defendants maintain that § 22a-16 authorizes the plaintiff's pursuit of an environmental cause of action for negligent contamination only if that contamination was *caused* by their treatment, storage or disposal of hazardous waste, waste oil or petroleum or chemical liquids. As the defendants note, the plaintiff's complaint is so phrased. Once the property became vacant, the defendants did not *cause* further pollution. In other words, the plaintiff's failure to charge them with an "omission" of their continuous duty to remediate the pollution and his concomitant failure to invoke an argument of *omission* in response to the motion for summary judgment now bars him from any recovery under § 22a-16.

This procedural argument, standing alone, might not be persuasive. It is buttressed, however, by the text of § 22a-16.

The plaintiff cites *Starr* v. *Commissioner of Environmental Protection*, 226 Conn. 358, 627 A.2d 1296 (1993), and *Starr* v. *Commissioner of Environmental Protection*, 236 Conn. 722, 675 A.2d 430 (1996). Those cases involved the question whether an innocent landowner

bore liability for "maintaining" preexisting environmental contamination by failing to undertake remedial measures. Until the legislature created an innocent landowner defense, the Supreme Court construed the applicable statute, General Statutes § 22a-432, to impose continuing liability for maintaining a condition that reasonably could be expected to create a source of pollution. *Starr* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 395.

The *Starr* cases are, however, distinguishable because the governing statute, § 22a-432, expressly imposed liability on a property owner who maintained a contaminated condition on his property. Section 22a-16 has no comparable language. We decline to engraft language on § 22a-16 that it does not contain. See *Spears* v. *Garcia*, 263 Conn. 22, 32, 818 A.2d 37 (2003); *Coalition to Save Horsebarn Hill* v. *Freedom of Information Commission*, 73 Conn. App. 89, 97, 806 A.2d 1130 (2002), cert. denied, 262 Conn. 932, 815 A.2d 132 (2003).

We conclude, therefore, that the trial court properly granted the defendants' motion for summary judgment with respect to the plaintiff's statutory claim under § 22a-16. It might be troublesome that the statute of limitations had run on this claim even before the plaintiff purchased the property if the plaintiff had not unequivocally assumed all environmental risks by the terms of the contract of sale to which he subscribed.

The judgment is affirmed.

In this opinion the other judges concurred.