TAMAS BIRO ET AL. *v.* VICTOR H. MATZ ET AL.
(AC 32413)

Gruendel, Alvord and Flynn, Js.

Argued September 21—officially released November 29, 2011

*Richard P. Terbrusch*, for the appellants (plaintiffs).

*Thomas W. Beecher*, with whom, on the brief, was *Stephanie B. Nickse*, for the appellees (defendants).

FLYNN, J. This appeal originates from a contract for the purchase of commercial real estate in Danbury that was deeded to the buyers. The buyers appeal from the trial court's judgment granting the sellers' motion for summary judgment. On appeal, the buyers claim the court erred in finding there was no material question of fact with respect to their claims of breach of contract, negligent misrepresentation, intentional misrepresentation, fraudulent inducement, and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. We affirm the judgment of the trial court.

The following uncontested facts inform our review. The defendants, Victor H. Matz and Ingrid M. Luning (sellers), are siblings and the former owners of a commercial warehouse (premises) located in Danbury. More than thirty years ago in 1980, the sellers hired a contractor to construct an expansion to the warehouse. According to his deposition testimony, Matz believed the contractor would provide a certificate of occupancy based on the construction contract's warranties language, which provides in relevant part: "Warranties . . . all applicable local, state, [n]ational codes and good engineering practice . . . ." Matz also testified during his deposition that he had found a receipt from the city of Danbury for a certificate of occupancy, which he believed was indicative of issuance of a certificate of occupancy. The Danbury building department never informed Matz of any problematic issues relating to the construction either during or after the addition was built.

On or about July 11, 2006, the sellers entered into a contract with the plaintiffs, Tamas Biro and Vilmos Havasi (buyers), to sell the premises to the buyers in an "as is" condition and "with all faults . . . ." Both

sellers averred in their respective affidavits that they were not in the business of selling commercial real estate. Matz' factory had occupied the premises for years. His interest in selling the premises was to move his family's trophy and awards manufacturing business out of state, and Luning's interest was to invest her portion of the sale proceeds toward her retirement. Closing on this real estate transaction later took place, and the deed was delivered to the buyers.

Section 5 of the contract detailed the terms relating to the condition of the premises. Additionally, in contract terms that expressly survived the "closing and the deliver[y] of the deeds," the parties agreed that the buyers had "examined . . . the [p]remises," which were to be sold "as is," without any representation about the condition of the premises on which the buyers relied, unless specifically embodied in the agreement, "with all faults" existing. The buyers agreed that they had been requested to "investigate all matters" relevant to the premises and to rely solely on their own inspection or information obtained or otherwise available to them. The buyers were to "assume all future obligations and liabilities" related to the premises raised subsequent to closing.

By contrast, § 8, paragraph (a) of the contract, relied on by the buyers, stipulated that the property would be conveyed "subject to . . . [a]ny restrictions or limitations imposed or to be imposed by governmental authority, including the zoning and planning rules and regulations of the [c]ity or [t]own, and region or district, if any, in which the [p]remises is situated, provided the same are not being violated by the subject premises and the building thereon." This paragraph did not indicate that it would survive the passage of the deed.

A title affidavit from Fidelity National Title Insurance Company of New York, representing that "[t]here have

been no additional buildings constructed, or additions added to existing buildings, on the property within the past three (3) years," also was executed at the time of closing. The "survey update" section of the title affidavit provides in relevant part: "I/We have examined a certain survey of the property made by          dated and entitled, '          '." The blank spaces were never completed by the buyers' counsel, who prepared the affidavit, nor by the sellers.

On or about February 9, 2008, the buyers received an offer from R & J Electrical Contractors, LLC (R & J Electrical), to purchase the premises for $1.4 million. The parties entered into a contract of sale on April 27, 2008, with R & J Electrical agreeing to pay a sum of $1.4 million for the property. Prior to closing, the appraiser from the mortgage bank informed Richard Gustavson, the owner of R & J Electrical, that the appraisal value of the premises was $1 million. Gustavson also conducted his due diligence prior to closing and discovered that no certificate of occupancy ever was issued for the premises by the city of Danbury. Gustavson then submitted a new offer of $1 million to purchase the building, but this offer was rejected by the buyers. As a result of this rejection, R & J Electrical decided not to purchase the premises, and title has remained in the buyers ever since.

Because part of the premises lacked an occupancy permit, the buyers brought an action against the sellers in Danbury Superior Court on November 21, 2008, alleging breach of contract, negligent misrepresentation, intentional misrepresentation, fraudulent inducement, and violations of CUTPA. The buyers relied heavily on the language in § 8 of the contract, stipulating that conveyance of the property was subject to local zoning regulations, provided they were not violated, as the primary basis for their arguments relating to the first four counts of the complaint. However, the trial court

concluded that the terms of the contract merged into the conveyance deed that replaced and superseded the underlying terms of the contract, on which the buyers relied, when the deed was formally accepted by the buyers. The court then quoted the pertinent provisions of General Statutes § 42-110b (a), which is part of CUTPA and which provides in relevant part that "[n]o person shall engage in unfair . . . acts or practices in the conduct of any trade or commerce." The court rejected the buyers' CUTPA claim by concluding that CUTPA applies only to sellers engaged in the business of selling commercial real estate and the sellers did not engage in such business. The court rendered summary judgment as to all counts in the sellers' favor on June 9, 2010. This appeal followed.

We begin by setting forth our well established standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court. . . . Our review of the trial court's decision to grant [a] . . . motion for summary judgment is plenary." (Internal quotation marks omitted.) *Jaiguay* v. *Vasquez*, 287 Conn. 323, 362, 948 A.2d 955 (2008).

"An appellate court's review of a trial court decision is circumscribed by the appropriate standard of review. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Powers* v. *Olson*, 252 Conn. 98, 104–105, 742 A.2d 799 (2000).

"Where [as here] . . . there is clear and definitive contract language, the scope and meaning of that language is not a question of fact but a question of law. . . . In such a situation our scope of review is plenary, and is not limited by the clearly erroneous standard." (Internal quotation marks omitted.) *Antonino* v. *Johnson*, 113 Conn. App. 72, 75, 966 A.2d 261 (2009).

Because the trial court rendered judgment in favor of the sellers as a matter of law and our resolution of this appeal requires a review of the contractual language, our review is plenary. With this standard in mind, we examine each of the buyers' claims in turn.

I

The buyers first contend that the trial court improperly concluded that there was no question of material fact with respect to the breach of contract claim. Specifically, the buyers argue that there is a genuine issue of material fact as to whether (1) the sellers breached the terms of the contract when they conveyed the property without a proper certificate of occupancy for part of its improvements, and (2) the breached terms of the contract survived the closing and delivery of the deed. We disagree.

A

We first address the issue of what terms of the contract survived the closing and delivery of the deed. Unless the contract expressly provides that certain

terms shall survive, "it is axiomatic that a deed super-sedes the underlying contract." *Powers* v. *Olson*, supra, 252 Conn. 106. "[A]ccceptance of a deed in pursuance of articles of agreement for the conveyance of land is prima facie the completion of the contract; and all stipulations contained therein . . . are merged in the deed although omitted therefrom . . . ." (Internal quotation marks omitted.) Id., quoting *Knight* v. *Breckheimer*, 3 Conn. App. 487, 490, 489 A.2d 1066 (1985).

There are two grounds on which we can sustain the court's judgment. One is the contractual "as is" language indicating that the covenant survives transfer of the deed, and the other is the "merger by deed" doctrine found in our case law. We address each in turn.

1

In our analysis of the "as is" clause, we first state what is not at issue in this case. The affidavits and supporting documents do not show any scienter or guilty knowledge on the part of the sellers, Matz and Luning, that there was any lack of a certificate of occupancy at the time they signed the sales agreement with the buyers or when they conveyed title to them. Nor is there any claim here that the contractual survival language violates public policy.

In analyzing the effect of the "as is" provision of the contract, we give effect to all relevant provisions and construe the contract as a whole. *Lanna* v. *Greene*, 175 Conn. 453, 458, 399 A.2d 837 (1978). Not only did the contract indicate that the premises was being sold "as is" and "with all faults," it did not contain any representations as to whether certificates of occupancy were available for part or all of the premises. Furthermore, the contract specifically stated there was no representation on which the buyers relied except as provided in the contract. Finally, the buyers acknowledged in the agreement that they had been requested to "investigate

all matters" related to the premises and to rely on the information they obtained and assumed "all obligations and liabilities" raised subsequent to the closing. The contractual language is clear.

The purpose and effect of an "as is" clause is to shift the burden regarding mistake or defect to the accepting party, in this case, the buyers. See *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 757, 628 A.2d 1298 (1993). "[A] court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract . . . ." Id., 756. It is clear that the buyers agreed to accept the premises in an "as is" condition and with "all faults" pursuant to § 5 (b) of the contract. Assuming that a portion of the premises lacked a partial certificate of occupancy that remained a potential burden relating to the property, § 5 contained express provisions in paragraphs (b) and (e) indicating that the "as is" terms were to survive closing and deliverance of deed. By accepting the delivery of the deed, the buyers accepted the property "as is" and "with all faults," which included assuming any potential burden associated with the premises' lack of a certificate of occupancy for some part of it.

2

We next address how the principle of merger by deed voided certain provisions of the underlying contract while preserving others once title was conveyed. "[U]nder the principle of merger by deed, the terms of the deed . . . automatically replace and supersede the terms of the underlying contract, absent a reservation of collateral rights." *Mongillo* v. *Commissioner of Transportation*, 214 Conn. 225, 231, 571 A.2d 112 (1990). Our case law provides examples where the terms of an underlying agreement no longer bound the

parties because they merged with the deed upon conveyance of title. See id. (had terms of prior stipulated judgment in eminent domain proceeding differed from terms of deed, terms of deed would replace and supersede terms of judgment upon deed's conveyance); *Powers* v. *Olson*, supra, 252 Conn. 108–109 (seller did not retain slope rights to property because seller removed express terms authorizing those rights in deed prior to conveying title to buyer); *Knight* v. *Breckheimer*, supra, 3 Conn. App. 490–91 (seller's representation in sales agreement that septic system must be in working order merged with deed because of express language in agreement stating that provision would not survive delivery of deed).

In this case, the buyers reference the language of § 8 of the contract, "Encumbrances," to support their position that the terms of this provision were breached when title was conveyed to them without a certificate of occupancy having been issued for part of the premises. That section provides in relevant part: "In addition to the exceptions to title mentioned in Schedule A, the [p]remises will be conveyed subject to . . . (a) [a]ny restrictions or limitations imposed or to be imposed by governmental authority, including the zoning and planning rules and regulations of the [c]ity or [t]own, and region or district, if any, in which the Premises are situated provided the same are not being violated by the subject premises and the building thereon." Fatal to this claim, however, is the fact that the terms and provisions of § 8 were merged with, superseded, and replaced by the terms of the deed at the time of closing because § 8 contained no express language indicating that it would survive conveyance of title. Section 5 of the contract, however, did contain such survival language and expressly indicated that the seller had no further obligations with respect to the premises once the deed was delivered to the buyers.

Furthermore, we do not agree that § 8 contains any affirmative representations that the language "subject to . . . [a]ny restrictions or limitations imposed or to be imposed by governmental authority" made any affirmative representation about certificates of occupancy. The contract left the buyers to make their own investigations, and the provisions that there be no violations related only to whether the buyers were obligated to purchase if such violations were discovered by the buyers and raised as an objection prior to closing.[1]

Our agreement with the trial court's finding that § 8 merged with the deed while § 5 was preserved after conveyance of title also is consistent with the Latin maxim of expressio unius est exclusio alterius or "the expression of one thing is the exclusion of another." Long a staple of our statutory interpretation, this court also has applied the principle to contractual agreements. See *Best Friends Pet Care, Inc.* v. *Design Learned, Inc.*, 77 Conn. App. 167, 179–80, 823 A.2d 329 (2003) (applying principle of expressio unius est exclusio alterius to waiver clause of construction contract). Applying this principle to the present case, it is evident that only those sections of the contract containing affirmative survival language survived delivery of the deed, while those sections lacking such language were excluded from the deed by deliberate choice. Consequently, the trial court committed no error concluding that the § 8 provisions merged with the deed.

B

We next consider whether the terms of the remaining contract were breached when the premises were conveyed to the buyers without a certificate of occupancy.

---

[1] The sellers and buyers each have two different versions of the written sales contract. In one version of the sales contract, § 8 (a) concludes with the phrase "provided the same are not being violated by the subject premises and the building thereon," which was handwritten. In another version of the sales contract, § 8 (a) concludes with the phrase "provided there is no violation of the same." The buyers reference the former language and the

The buyers took title to the premises "as is" and "with all faults" as made expressly clear by § 5 (b). Accordingly, accepting the title to the property "as is" precludes the buyers from raising an argument that the property was defective for lack of a certificate of occupancy. The buyers maintain that § 5 pertains only to the physical condition of the property and is silent on the issue as to whether the premises complied with local zoning regulations, which is governed by § 8. However, even if § 8 were to survive closing, and we have held that it does not, § 5 (d) of the contract makes explicitly clear that "the [b]uyer shall assume all future obligations and liabilities related to the [p]remises which may be raised subsequent to the closing with respect to the [p]remises." Such language is sufficiently broad to encompass obligations and liabilities assumed by the buyers for purchasing property that lacked a certificate of occupancy. Had the buyers exercised their due diligence prior to closing, they might have refused to close and accept title until any lacking certificate of occupancy was obtained. As it stands, however, there is no representation in the contract imposing liability on the sellers after closing for a claimed zoning violation of this nature where this claim was not raised by the buyers prior to closing of title.

The buyers also allege that a genuine issue exists as to whether the provisions of § 8 were breached. As explained in part I A of this opinion, § 8 (a) made no affirmative representation regarding certificates of occupancy. Nevertheless, even if § 8 did contain such an affirmative representation, § 8 contained no survival language and, consequently, merged with the deed upon conveyance of title.

sellers reference the latter language in their respective briefs. Neither phrase alters our interpretation that § 8 (a) made no affirmative representations regarding certificates of occupancy.

We therefore conclude that the trial court committed no error in its legal and logical conclusions by finding that the breached terms did not survive closing and that no breach of the contract occurred when the sellers conveyed property without a proper certificate of occupancy.

## II

The buyers also claim that the trial court improperly concluded that there was no material question of fact with regard to the buyers' negligent misrepresentation claim. The buyers maintain that genuine questions exist as to whether (1) the sellers represented that the property did not violate local zoning laws, (2) the "as is" and "with all faults" clauses of § 5 were specific to that section and did not negate other representations expressed in the contract, and (3) the sellers represented that no additional improvements were constructed or exterior alterations were made. We disagree with the buyers.

"Our Supreme Court has long recognized liability for negligent misrepresentation. . . . The governing principles [of negligent misrepresentation] are set forth in similar terms in § 552 of the Restatement (Second) of Torts (1977): One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Internal quotation marks omitted.) *Rafalko* v. *University of New Haven*, 129 Conn. App. 44, 52, 19 A.3d 215 (2011). It must be established that there was a false representation in order for a plaintiff to prevail on a negligent misrepresentation claim. *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 792–93, 734 A.2d

112 (1999). A plaintiff also is required to show that he reasonably relied on the misrepresentation. *Visconti* v. *Pepper Partners Ltd. Partnership*, 77 Conn. App. 675, 682, 825 A.2d 210 (2003).

## A

The buyers first claim that a genuine question exists as to whether the provisions of § 8 create an affirmative representation that the premises were not in violation of local zoning regulations at the time that title passed to them.

"[W]e interpret contract language in accordance with a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . If the terms of [a contract] are clear, their meaning cannot be forced or strained by an unwarranted construction to give them a meaning which the parties obviously never intended. . . . A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (Internal quotation marks omitted.) *Santana* v. *Hartford*, 94 Conn. App. 445, 463–64, 894 A.2d 307 (2006), aff'd, 282 Conn. 19, 918 A.2d 267 (2007).

The provisions of § 8 provide in relevant part: "In addition to the exceptions to title mentioned in Schedule A, the [p]remises will be conveyed subject to . . . (a) [a]ny restrictions or limitations imposed or to be imposed by governmental authority, including the zoning and planning rules and regulations of the [c]ity or [t]own, and region or district, if any, in which the [p]remises are situated. Provided the same are not being violated by the subject premises and building thereon." The buyers disagree with the trial court's interpretation

that this portion of § 8 did not constitute an affirmative representation by the sellers that the property was not currently in violation of any restrictions or limitations imposed by zoning and planning rules and regulations.

Even if we were to accept the buyers' interpretation of § 8, we would, nonetheless, still affirm the court's judgment because the buyers have presented no genuine issue to indicate that they reasonably relied on the alleged misrepresentation to their detriment. See *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 514–15, 890 A.2d 140 (buyers' claimed reliance on sellers' misrepresentation not reasonably justifiable when buyers contractually agreed to rely on their own investigation and examination of premises and not on any representations made by sellers), cert. denied, 277 Conn. 928, 895 A.2d 798 (2006); *Visconti* v. *Pepper Partners Ltd. Partnership*, supra, 77 Conn. App. 683–84 (buyers could not reasonably rely on oral statements by sellers regarding absence of subterranean storage tanks on property when buyers had personal knowledge of soil contamination and were contractually bound independently to investigate the environmental condition of property).

The buyers, in response to a request for admissions, conceded that they had read the contract and entered into it only after consulting legal counsel. The provisions of § 5 required that the buyers inspect the premises prior to closing, and the buyers acknowledge that they did fully inspect the premises or at least were satisfied with their opportunity to do so. Similar to the contract clause in *McCann Real Equities Series XXII, LLC*, § 5 (a) of the contract provided that the sellers not make "any representation or promise upon which the [buyers have] relied *concerning any aspect of this transaction,* including, but not limited to, the condition, quality, use or value of the [p]remises." (Emphasis

added.) The buyers further agreed to accept the premises in an "as is" condition and "with all faults." There is therefore no genuine issue that § 8 created an affirmative representation that the premises were not in violation of local zoning regulations, nor that the buyers relied on this section to their detriment.

B

The buyers next contend that a genuine issue exists whether the "as is" and "with all faults" provisions of § 5 are limited to that section only and do not negate other sections of the contract. We disagree for the same reasons as previously articulated in part I B of this opinion and do not repeat that analysis.

C

The buyers also assert that a genuine question exists as to whether the sellers represented that no additional improvements were constructed or exterior alterations were made. Specifically, the buyers disagree with the trial court's determination that the "survey update" section of the title affidavit did not constitute an affirmative representation that the sellers assured, guaranteed, or promised that the addition to the premises complied with local zoning regulations. We agree with the trial court that no affirmative representation in this section exists.

The "survey update" section of the title affidavit provides in relevant part: "(1) I/We have examined a certain survey of the property made by          dated
and entitled, '          '. (2) There have been no additional improvements constructed or exterior alterations made since the date of this survey and the survey reflects the current status of the property." The blank spaces of this section were never completed by either party. It is clear that this section makes no representation whatsoever that the premises complied with local

zoning regulations. No piece of property is identified specifically, and the blank spaces are left unfilled indicating that a survey never took place. No representation can be discerned in § 2 of the "survey update" because the existence of any representation made by that section is dependent upon a survey being completed in the prior section. The trial court therefore correctly concluded that this portion of the title affidavit did not constitute an affirmative representation of any kind.

III

We next turn to the buyers' claim that the trial court erred in finding that no genuine issue of material fact existed regarding the intentional misrepresentation and fraudulent inducement claims.

Our case law has construed fraudulent misrepresentation and intentional misrepresentation to be identical causes of action. *Kramer* v. *Petisi*, 285 Conn. 674, 684 n.9, 940 A.2d 800 (2008) ("[w]e . . . note that, at common law, fraudulent misrepresentation and intentional misrepresentation are the same tort"). This court has also used the terms fraudulent misrepresentation and fraudulent inducement interchangeably. See *Harold Cohen & Co.* v. *Harco International, LLC*, 72 Conn. App. 43, 50–51, 804 A.2d 218, cert. denied, 262 Conn. 903, 810 A.2d 269 (2002); *Dorsey* v. *Mancuso*, 23 Conn. App. 629, 633, 583 A.2d 646 (1990), cert. denied, 217 Conn. 809, 585 A.2d 1234 (1991).

To assert a claim for intentional misrepresentation or fraudulent inducement, the buyers must prove that (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 260 Conn. 766, 777, 802 A.2d 44

(2002). We conclude that the trial court properly rendered summary judgment on this claim because the buyers raised no genuine issue of material fact to satisfy the second prong showing that the sellers knew that the premises lacked a certificate of occupancy.

According to his deposition testimony, Matz believed the contractor would provide a certificate of occupancy based on the construction contract's warranties language that provided in relevant part: "Warranties . . . all applicable local, state, [n]ational codes and good engineering practice . . . ." Matz also testified during his deposition that he had found a receipt from the city of Danbury for a certificate of occupancy that he believed was indicative of issuance of a certificate of occupancy. The Danbury building department never informed Matz of any problematic issues relating to the 1980 addition either during construction or after the addition was built on the premises. The buyers raised no further factual issue in the record to dispute these facts or to show that the sellers possessed actual knowledge that a certificate of occupancy was never issued. We therefore conclude that the trial court committed no error in rendering judgment in favor of the sellers as to the intentional misrepresentation and fraudulent inducement claims.

## IV

Finally, we consider the buyers' contention that the trial court erred in finding no material issue of fact regarding whether the sellers committed a violation of CUTPA when the sellers conveyed title without first obtaining a certificate of occupancy. We agree with the trial court that, because the sellers did not primarily engage in the business of selling real estate, the CUTPA provisions do not apply to this transaction.

Section 42-110b (a) provides in relevant part that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "Whether the

defendant is subject to CUTPA is a question of law, not fact." (Internal quotation marks omitted.) *Muniz v. Kravis*, 59 Conn. App. 704, 712, 757 A.2d 1207 (2000). However, claims made against noncommercial sellers of real property may fail on a determination that CUTPA does not apply to such transactions. 1 R. Langer, J. Morgan & D. Belt, Connecticut Unfair Trade Practices Act (1994) § 4.7, p. 142. "Moreover, a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce." (Internal quotation marks omitted.) *Sovereign Bank v. Licata*, 116 Conn. App. 483, 494, 977 A.2d 228, cert. granted on other grounds, 293 Conn. 935, 981 A.2d 1080 (2009). In *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, supra, 93 Conn. App. 523, this court held that a transaction to sell real property by an automobile dealership did not implicate any violation of CUTPA because the transaction was merely incidental to the sellers' primary business of the sale and servicing of automobiles and the sellers were not "in the business" of selling real property.

Because the sellers in the present case are not in the business of selling real property, CUTPA is inapplicable to the transaction in this case. Matz sold the property to the buyers because he wanted to move his family's trophy manufacturing and specialty gifts business to North Carolina. Luning wished to sell the property in order to help finance her retirement. Nothing in the record or the affidavits, exhibits and supporting documents attached to the motion for summary judgment or the opposition filed in response to it suggests that either of the sellers ever had engaged in the "trade or commerce" of selling real estate in the past or that they planned to do so in the future. The trial court therefore committed no error in rendering judgment in favor of the sellers as to the CUTPA violation claim.

The judgment is affirmed.

In this opinion the other judges concurred.